**Excolo Law, PLLC**
Keith L. Altman (SBN 257309)
Solomon M. Radner (*pro hac vice pending*)
26700 Lahser Road, Suite 401
Southfield, MI 48033
516-456-5885
Email:  kaltman@lawampmmt.com
           sradner@excololaw.com

**1-800-LAW-FIRM, PLLC**
Ari Kresch (*pro hac vice pending*)
26700 Lahser Road, Suite 400
Southfield, MI 48033
800-529-3476
Email: akresch@1800lawfirm.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DEMETRICK PENNIE,**<br><br>PLAINTIFF,<br>**V.**<br><br>**TWITTER, INC., GOOGLE INC., FACEBOOK, INC.**<br><br>DEFENDANTS. | **VERIFIED COMPLAINT**<br>**JURY TRIAL DEMANDED**<br><br>1. **AIDING AND ABETTING IN VIOLATION OF 18 U.S.C. § 2333(a) and (d)**<br>2. **CONSPIRACY IN VIOLATION 18 U.S.C. § 2333(a) and (d)**<br>3. **PROVISION OF MATERIAL SUPPORT IN VIOLATION OF 18 U.S.C. § 2339a AND 18 U.S.C. § 2333**<br>4. **PROVISION OF MATERIAL SUPPORT IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)**<br>5. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS** |

1   Plaintiff, by and through his attorneys, allege the following against Defendants Twitter,
2   Google, and Facebook:

### NATURE OF ACTION

1.  For years, Defendants have knowingly and recklessly provided the terrorist group HAMAS with accounts to use its social networks as a tool for spreading extremist propaganda, raising funds, and attracting new recruits. This material support has been instrumental to the rise of HAMAS and has enabled it to carry out numerous terrorist attacks and to incite others to carry out terrorist attacks, including the July 7, 2016 shooting of Dallas Police Officers by Micah Johnson who was radicalized, in part, by HAMAS' use of Defendants' sites.  In the attack, five officers were murdered, nine officers were wounded.  Others, such as Plaintiff Pennie suffered severe emotional distress, continue to receive threats, and live in fear of death or serious bodily harm.



*Figure 1 Demetrick Pennie*

2.   Without Defendants Twitter, Facebook, and Google (YouTube), HAMAS' ability to radicalize and influence individuals to conduct terrorist operations outside the Middle East would not have been possible.  Like HAMAS, Defendants also allow ISIS to use their sites to conduct terrorist operations.   According to the Brookings Institution, ISIS "has exploited social media, most notoriously Twitter, to send its propaganda   and messaging out to the world and to draw in people vulnerable to radicalization."   Using Defendants' sites, "ISIS has been able to exert an outsized impact on how the world perceives it, by disseminating images of graphic violence (including the beheading of Western journalists and aid workers) . . . while using social media to attract new recruits and inspire lone actor attacks."   According to FBI Director James Comey, ISIS has perfected its use of Defendants' sites to inspire  small-scale  individual attacks, "to crowdsource terrorism" and "to sell murder."

3.  Since first appearing on Twitter, terrorist accounts on Twitter have grown at an astonishing rate and, until recently, ISIS and HAMAS maintained official accounts on Twitter unfettered. These official accounts included media outlets, regional hubs and well-known HAMAS and ISIS members, some with tens of thousands of followers. For example, HAMAS's official twitter page @HamasInfoEn has 37.3 thousand followers.



*Figure 2 HAMAS' official Twitter page.*

4.  The Arabic version of HAMAS' official twitter page @hamasinfo has been active since October 2010 and boasts 281,000 followers.[1]

5.  Another HAMAS twitter account @HamasGlobalPR  has been active since June 2010 and boasts 9,593 followers.[2]

---

1 https://twitter.com/hamasinfo?lang=en
2 https://twitter.com/hamasglobalpr?lang=en

6.   As with Twitter, HAMAS has used Google (YouTube) and Facebook in a similar manner. Defendants are fully aware that HAMAS and other extremist groups use their sites to conduct terrorist operations.

7.   Plaintiffs' claims are based not upon the content of HAMAS' social media postings, but upon Defendants provision of the infrastructure which provides material support to HAMAS.   Furthermore, Defendants profit from HAMAS by placing ads on HAMAS' postings.  For at least one of the Defendants, Google, revenue earned from advertising is shared with HAMAS.   Lastly, Defendants incorporate HAMAS' postings to create unique content by combining the HAMAS postings with advertisements selected by Defendants based upon HAMAS' postings and the viewer looking at the postings and the advertisements.

## **PARTIES**

8.   Plaintiff Demetrick Pennie ("Pennie") is a citizen of the United States domiciled in the State of Texas and is over the age of 18.  Pennie has served as a police officer for seventeen years and is now a sergeant with the Dallas Police Department. Pennie served four years in the United States Army from 1995 until 1999 and held the rank of E-4 Specialist when he was honorably discharged. He also holds a Bachelor's Degree from Midwestern State University, a Masters' Degree from Prairie View A&M University, and is in his final semester of his Ph.D. program at Texas Tech

University. Pennie is also the President of the Dallas Fallen Officer Foundation, which is a police support organization designed to assist the families of police officers killed or critically injured in the line of duty. As a result of Defendants allowing HAMAS and other terrorist organizations to conduct terrorist operations using their sites, Pennie has personally been threatened with death and serious bodily harm by Defendants, acting alone and/or in concert.  Pennie has also suffered severe emotional distress

9.   Defendant Twitter, Inc. ("Twitter") is a publicly traded U.S. company incorporated in Delaware, with its principal place of business at 1355 Market Street, Suite 900, San Francisco, California 94103.

10.   Defendant Facebook, Inc. ("Facebook") is a publicly traded U.S company incorporated in Delaware, with its principal place of business at 1601 Willow Road, Menlo Park, California, 94025.

11.   Defendant Google Inc. ("Google") is a publicly traded U.S company incorporated in Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google owns the social media site YouTube.  For the purposes of this complaint, Google and YouTube are used interchangeably.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 18 U.S.C. § 2333(a) as a civil action brought by a citizen of the United States injured by reason of an act of international terrorism and the estate, survivor, or heir of a United States citizen injured by reason of an act of international terrorism.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this district and Defendants are headquartered in this district.

## **ALLEGATIONS**

14. HAMAS is an offshoot of the radical militant Islamist organization known as the Muslim Brotherhood. The Muslim Brotherhood was founded in Egypt in 1928. The Muslim Brotherhood's mottos include: "Islam is the answer"; and "*Allah* is our objective, the *Qur'an* is the Constitution, the Prophet [Mohammed] is our leader, *jihad* [holy war] is our way, death for the sake of *Allah* is our wish."

15. When Palestinians launched the "First *Intifada*" (or "uprising") against Israel in December 1987, the leader of the Muslim Brotherhood in Gaza, Sheik Ahmad Yassin formed *Harakat al-Muqawama al-Islamiyya* (the "Islamic Resistance Movement") to join in the violence against Israel and to establish an alternative Islamist movement to challenge the largely secular Palestinian Liberation Organization's ("PLO") claim as the exclusive leadership of the Palestinians. The

Islamic Resistance Movement is known by its Arabic acronym: "HAMAS." The following are the emblem and flag of the terrorist organization HAMAS:

 

*Figure 3: the HAMAS emblem and flag*

16. Article 6 of the HAMAS Charter states: "The Islamic Resistance Movement is a distinguished Palestinian movement, whose allegiance is to *Allah*, and whose way of life is Islam. It strives to raise the banner of *Allah* over every inch of Palestine." Article 13 states: "Palestine is an Islamic land . . . Since this is the case, the Liberation of Palestine is an individual duty for every Muslim wherever he may be." Article 15 states: "The day the enemies usurp part of Muslim land, *Jihad* becomes the individual duty of every Muslim. In the face of the Jews' usurpation, it is compulsory that the banner of *Jihad* be raised."

17. The *Izz al-Din al-Qassam* Brigades (the "*al-Qassam* Brigades") is a constituent paramilitary organization within HAMAS known for carrying out many of HAMAS's terrorist attacks, including shootings, suicide bombings, IED bombings, missile attacks, underground tunnel attacks, and more. HAMAS and the *al-Qassam*

Brigades also have other paramilitary units and brigades, often named after prominent HAMAS leaders considered "martyrs" by HAMAS. The following is the emblem of the *al-Qassam* Brigades:



*Figure 4: Emblem of the al-Qassam Brigades*

18. HAMAS also has other constituent organizations and associations that are controlled by HAMAS that operate as part of HAMAS and carry out its activities, including HAMAS's student wing, the Islamic Bloc. The following is the emblem of HAMAS' Islamic Bloc:



*Figure 5: Emblem of the HAMAS' Islamic Bloc*

19. Between the time of its founding in December 1987 until the present, HAMAS carried out thousands of terrorist attacks in Israel, the West Bank, and Gaza, murdering hundreds of Israeli and U.S. citizens, as well as the nationals of many other countries, and wounding thousands more. HAMAS's policy and practice of

carrying out terrorist attacks was and are notorious and well-known to the public at large and to social media.

## Terrorist Designation of HAMAS

20. On October 8, 1997, the U.S. Secretary of State officially designated HAMAS (including specifically its "*Izz al-Din al-Qassam* Brigades") as a "Foreign Terrorist Organization" ("FTO") pursuant to § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, as amended by the AEDPA. 62 Fed. Reg. 52650 (1997). This designation remains in effect to this day.

21. After the September 11, 2001, terrorist attacks on the United States, U.S. President George W. Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States." Executive Order No. 13224 blocked all property and interests in property of "Specially Designated Global Terrorists" ("SDGT"s), prohibited the provision of funds, goods or services for the benefit of SDGT's, and authorized the U.S. Treasury to block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, SDGT's, as well as their subsidiaries, front organizations, agents, and associates.

22. The U.S. Secretary of State officially designated HAMAS (including its *Izz al- Din*

*al-Qassam* Brigades) as an SDGT pursuant to Executive Order No. 13224 on October 31, 2001. 67 Fed. Reg. 12633-12635 (2002). This designation remains in effect to this day.

23. Between 1999 and the dates of the terrorist attacks at issue in this case, the courts of the United States, including this Court, have published a number of decisions finding that HAMAS was responsible for terrorist attacks in which American and Israeli citizens were killed or injured.

## HAMAS is Dependent on Twitter, YouTube, and Facebook to Terrorize

## HAMAS Uses Defendants to Recruit New Terrorists

24. One of HAMAS's primary uses of Defendants' sites is as a recruitment platform, particularly to draw fighters from Western countries.

25. HAMAS reaches potential recruits by maintaining accounts on Twitter, YouTube, and Facebook so that individuals across the globe may reach out to them directly. After the first contact, potential recruits and HAMAS recruiters often communicate via Defendants' Direct Messaging capabilities. This is similar to methods used by ISIS in conducting ISIS-sponsored terrorist activities. According to FBI Director James Comey, "[o]ne of the challenges in facing this hydra-headed monster is that if (ISIS) finds someone online, someone who might be willing to travel or kill in place they will begin a twitter direct messaging contact." Indeed, according to the Brookings Institution, some ISIS members "use Twitter purely for private messaging

or covert signaling."   As with ISIS, HAMAS uses Defendants sites for similar purposes.

26.   The Washington Institute reported that social media "enables terrorist groups to conduct a virtual recruitment drive that, while passive and intangible, has the capacity to reach out to a far larger audience -- one that can be reached at any time of day, in any weather, under any conditions (i.e., even when neighborhoods are under curfew or closure), and anywhere -- not just the West Bank and Gaza Strip, but the world entire. To this end, Hamas operates websites in Arabic, English, Russian, French, Faris (Persian), Urdu, and Malay, which are run off servers in the United States, Russia, Ukraine, and Indonesia.[3]

27.   CBC also reported that HAMAS recruits through social media. Gabriel Weimann, of the University of Haifa, stated that "Today, about 90 percent of organized terrorism on the internet is being carried out through social media. By using these tools, the organizations are able to be active in recruiting new friends without geographical limitations."[4]

28.   Hamas has also used YouTube videos as a way to solicit potential recruits. One example of this is the video below which is a recruitment video meant for children.

---

3 http://www.washingtoninstitute.org/policy-analysis/view/teaching-terror-how-hamas-radicalizes-palestinian-society
4 http://www.cbc.ca/news/technology/terrorist-groups-recruiting-through-social-media-1.1131053

1
2
3
4
5
6
7
8
9
10
11
12

*Figure 6: A HAMAS recruitment video for children posted on YouTube*

13
14

## **HAMAS Uses Defendants to Fund Terrorism**

15

16   29.   HAMAS also uses Defendants to raise funds for its terrorist activities.

17

18   30.   It has been reported that HAMAS has used Facebook to as a medium to ask other

19          users for money.

20



21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15

*Figure 7: Posts from HAMAS on Facebook requesting donations*

16   31. This same source also reported that a different Hamas supporter was using Facebook

17       and twitter to support crowdfunding for HAMAS. [5]

18
19   32.   As discussed more fully below, YouTube approves of HAMAS videos allowing for

20        ads to be placed with HAMAS videos.   YouTube earns revenue from these

21        advertisements and shares a portion of the proceeds with HAMAS.

22
23   33.   Below is an example of a video posted by HAMAS on YouTube with a propaganda

24        video seeking viewers to support HAMAS's cause online.

25
26
27
     _____
28   5 http://david-collier.com/facebook-pipeline-funding-hamas-terrorism/



*Figure 8: A YouTube video asking users to support HAMAS*

## ISIS Uses Defendants' Sites to Spread Its Propaganda

34. HAMAS also uses Defendants' sites to spread propaganda and incite fear by posting graphic photos and videos of its terrorist feats.

35. Through Defendants' sites, HAMAS disseminates its official media publications as well as posts about real-time atrocities and threats to its perceived enemies.

36. Ismail Haniyeh, the top HAMAS leader in the Gaza Strip, has maintained a Twitter account since March 2012 and has 27.2 thousand followers. Khaled Mashaal, the group's chief, has had an account active since August 2014, now with 2,314 followers. The main HAMAS Twitter page, active since October 2010, has 37.1 thousand followers.

37. On March 13, 2015, HAMAS launched a twitter campaign #AskHAMAS to reach out to potential recruits and connect with the general public.

38. HAMAS's official websites have included hyperlinks (signified by Facebook's symbol "f") to Facebook pages operated by HAMAS, as shown in the following screenshot from HAMAS's primary official Arabic website:



*Figure 9: Screenshot of HAMAS website with hyperlinks to Defendants' websites*

39. HAMAS information websites and forums also maintain Facebook accounts, which they use to promote and carry out HAMAS activities. Some of these HAMAS information websites and forums maintain multiple Facebook sites, including separate Facebook sites in Arabic and English.   One example of HAMAS information websites and forums that use Facebook to promote and carry out HAMAS activities is the Palestinian Information Center.[6]

---

6 https://www.facebook.com/PalinfoEN/?hc_ref=SEARCH&fref=nf

40. As discussed more fully below, YouTube approves of HAMAS videos allowing for ads to be placed with HAMAS videos.  YouTube earns revenue from these advertisements and shares a portion of the proceeds with HAMAS.

41. Below is an example of a video posted by HAMAS propaganda placed on YouTube featuring advertisements.



*Figure 10: A HAMAS YouTube video featuring advertisements for TreadClimber and AAA*

## **Defendants Knowingly Permit ISIS to Use Their Social Network**

## **The Use of Twitter by Terrorists Has Been Widely Reported**

42. On For years, the media has reported on the HAMAS use of Defendants' social media sites and their refusal to take any meaningful action to stop it.

43. On November 12, 2012, thedailybeast.com released an article titled *Is HAMAS's Twitter Account Illegal*?[7]

44. On July 14, 2014, BBCwatch.org reported the use of misleading pictures on twitter by HAMAS for propaganda purposes.[8]

45. On March 13, 2015, several agencies (including the Washington post, Ibtimes, and news.vice.com) reported that HAMAS launched a twitter campaign #AskHAMAS. The campaign promised responses from the group's leaders, or as they called it, "Truth from the mouth of the horse." Bassem Naim, a HAMAS official, said the campaign was "a step by HAMAS to introduce it to the world in new languages – English, French and German – on the basis that the source is a direct HAMAS official, not through mediators or translators."[9]

## The Use of Facebook by HAMAS has Been Widely Reported

46. On January 10, 2012, CBC News Released an article stating that Facebook is being used by terrorist organizations for recruitment and to gather military and political intelligence "Many users don't even bother finding out who they are confirming as 'friend' and to whom they are providing access to a large amount of information on

---

7 http://www.thedailybeast.com/articles/2012/11/20/is-hamas-s-twitter-account-illegal.html
8 https://bbcwatch.org/2014/07/14/hamas-uses-bbc-brand-for-fauxtography-propaganda
9 *See* http://www.ibtimes.com/ask-hamas-palestinian-groups-twitter-campaign-challenge-terror-label-backfires-1846262; http://www.news.com.au/technology/online/social/hamas-mocked-as-twitter-campaign-backfires/news-story/ff289a6c06b99d9b5b144bb693b274c1; https://news.vice.com/article/askhamas-twitter-users-are-trolling-palestinian-islamist-groups-pr-campaign; https://www.washingtonpost.com/news/worldviews/wp/2015/03/12/hamass-askhamas-twitter-campaign-is-being-mocked-and-it-hasnt-even-started-yet/?utm_term=.b221ac9016e9

their personal life. The terrorists themselves, in parallel, are able to create false profiles that enable them to get into highly visible groups," he said[10].

47. On January 10, 2014, the Washington post released an article titled *Why aren't YouTube, Facebook, and Twitter doing more to stop terrorists from inciting violence?*[11]

48. On October 28, 2015, at the Radicalization: Social Media And The Rise Of Terrorism hearing it was reported that Zale Thompson who attacked four New York City Police Officers with an ax posted on Facebook "[w]hich is better, to sit around and do nothing or to wage jihad." [12]

49. At this same hearing, it was also reported that in September 2014 "Alton Nolen, a convert to Islam and ex-convict who had just been fired from his job at a food processing plant, entered his former workplace and beheaded an employee with a knife. This attack combines elements of workplace violence and terrorism. Nolen had been a voracious consumer of IS propaganda, a fact reflected on his Facebook page.[13]"

---

10 http://www.cbc.ca/news/technology/terrorist-groups-recruiting-through-social-media-1.1131053
11 https://www.washingtonpost.com/posteverything/wp/2014/07/10/farrow-why-arent-youtube-facebook-and-twitter-doing-more-to-stop-terrorists-from-inciting-violence/
12 https://oversight.house.gov/wp-content/uploads/2015/10/10-28-2015-Natl-Security-Subcommittee-Hearing-on-Radicalization-Purdy-TRC-Testimony.pdf
13 https://oversight.house.gov/wp-content/uploads/2015/10/10-28-2015-Natl-Security-Subcommittee-Hearing-on-Radicalization-Gartenstein-Ross-FDD-Testimony.pdf

50. On November 11, 2015, it was reported that one of the attackers from a terrorist bus attack two weeks prior "was a regular on Facebook, where he had already posted a "will for any martyr." Very likely, they made use of one of the thousands of posts, manuals and instructional videos circulating in Palestinian society these last few weeks, like the image, shared by thousands on Facebook, showing an anatomical chart of the human body with advice on where to stab for maximal damage." [14]

51. On April 8, 2016, the Mirror reported that "Jihadi fighters in the Middle East are using Facebook to buy and sell heavy duty weaponry." Because of Facebook's ability to create groups and to send secure payments through its Messenger application, it works as the perfect platform for illegal deals." [15]

### The Use of YouTube by HAMAS has Been Widely Reported

52. The media has widely reported on terrorists' use of YouTube and YouTube's refusal to take any meaningful action to stop it.

53. On January 10, 2014, the Washington post released an article titled *Why aren't YouTube, Facebook, and Twitter doing more to stop terrorists from inciting violence?*[16]

---

14 http://www.nytimes.com/2015/11/03/opinion/the-facebook-intifada.html?_r=1
15 http://www.mirror.co.uk/tech/isis-terrorists-use-facebook-buy-7713893
16 https://www.washingtonpost.com/posteverything/wp/2014/07/10/farrow-why-arent-youtube-facebook-and-twitter-doing-more-to-stop-terrorists-from-inciting-violence/

54. On July 7, 2014, CBS Local reported that "militants post beheading videos on sites like Google's YouTube, giving an image the chance to go viral before being shut down." [17]

55. On January 8, 2015, CBS News released an article titled *YouTube too overloaded to filter terrorist videos.*[18]

56. On August 6, 2015, Journal-Neo.org reported that "The well-known online video platform YouTube serves as the main media platform of these radical fighters." [19]

57. On August 29, 2015, the Independent released an article about how "The military wing of the Islamist group HAMAS has posted a propaganda video appearing to show off a new underground tunnel from its base in Gaza into Israel." [20]

58. On January 25, 2016, USA Today released an article titled "Remove terrorists from YouTube: Column," asserting that "If a curious individual searches for an al-Awlaki sermon online, YouTube will present a catalog of works that quickly leads from deceptively benign theological-based musings to calls for terrorist violence after only three or four videos."[21]

**Defendants Have Rebuffed Numerous Requests to Comply with U.S. Law**

17 http://sanfrancisco.cbslocal.com/2015/07/24/should-twitter-facebook-be-held-liable-for-a-terrorist-attack/
18 http://www.cbsnews.com/news/youtube-too-overloaded-to-filter-terrorist-videos/
19 http://journal-neo.org/2015/06/08/hi-tech-tools-of-isil-propaganda/
20 http://www.independent.co.uk/news/world/middle-east/hamas-post-youtube-video-appearing-to-show-underground-tunnel-from-gaza-into-israel-10478176.html
21 http://www.usatoday.com/story/opinion/2016/01/25/remove-terrorists-youtube-social-media-column/78939982/

59. Throughout this period, both the U.S. government and the public at large have urged Defendants to stop providing its services to terrorists.

60. In December 2011, an Israeli law group threatened to file suit against Twitter for allowing terrorist groups like Hezbollah to use its social network in violation of U.S. anti-terrorism laws.

61. In December 2012, several members of Congress wrote to FBI Director Robert Mueller asking the Bureau to demand that the Twitter block the accounts of various terrorist groups.

62. In a committee hearing held on August 2, 2012, Rep. Ted Poe, chair of the House Foreign Affairs Subcommittee on Terrorism, lamented that "when it comes to a terrorist using Twitter, Twitter has not shut down or suspended a single account." "Terrorists are using Twitter," Rep. Poe added, and "[i]t seems like it's a violation of the law." In 2015, Rep. Poe again reported that Twitter had consistently failed to respond sufficiently to pleas to shut down clear incitements to violence by terrorists.

63. Recently, former Secretary of State Hillary Clinton has urged Defendants to become more aggressive in preventing terrorists from using their network. "Resolve means depriving jihadists of virtual territory, just as we work to deprive them of actual territory," she told one audience. Later, Secy. Clinton stated that Twitter and other companies "cannot permit the recruitment and the actual direction of attacks or

the celebration of violence by this sophisticated Internet user. They're going to have to help us take down these announcements and these appeals."

64. On January 7, 2016, White House officials announced that they would hold high-level discussions with Defendants to encourage them "to do more to block terrorists" from using their services. "The primary purpose is for government officials to press the biggest Internet firms to take a more proactive approach to countering terrorist messages and recruitment online. . . . That issue has long vexed U.S. counterterrorism officials, as terror groups use Twitter . . . to spread terrorist propaganda, cultivate followers and steer them toward committing violence. But the companies have resisted some requests by law-enforcement leaders to take action . . ."

**Defendants Have Failed to Prevent HAMAS From Using its Services**

65. Despite these appeals, Defendants have failed to take meaningful action.

66. In a January 2011 blog post entitled "The tweets Must Flow," Twitter co-founder Biz Stone and Twitter General Counsel Alex Macgillivray wrote: "We don't always agree with the things people choose to tweet, but we keep the information flowing irrespective of any view we may have about the content."

67. On June 20, 2014, Twitter founder Biz Stone, responding to media questions about ISIS's use of Twitter to publicize its acts of terrorism, said, "[i]f you want to create a platform that allows for the freedom of expression for hundreds of millions of people around the world, you really have to take the good with the bad."

68. In September 2014, Twitter spokesperson Nu Wexler reiterated Twitter's hands-off approach, telling the press, "Twitter users around the world send approximately 500 million tweets each day, and we do not monitor them proactively." "The Twitter Rules" reiterated that Twitter "do[es] not actively monitor and will not censor user content, except in exceptional circumstances." In February 2015, Twitter confirmed that it does not proactively monitor content and that it reviews only that content which is reported by other users as violating its rules.

69. Most technology experts agree that Defendants could and should be doing more to stop HAMAS and other terrorist groups from using Defendants' social networks. "When Twitter says, 'We can't do this,' I don't believe that," said Hany Farid, chairman of the computer science department at Dartmouth College. Mr. Farid, who co-developed a child pornography tracking system with Microsoft, says that the same technology could be applied to terror content, so long as companies were motivated to do so. "There's no fundamental technology or engineering limitation," he said. "This is a business or policy decision. Unless the companies have decided that they just can't be bothered."

70. According to Rita Katz, the director of SITE Intelligence Group, "Twitter is not doing enough. With the technology Twitter has, they can immediately stop these accounts, but they have done nothing to stop the dissemination and recruitment of lone wolf terrorists."

71. Even when Defendants shut down a terrorist-linked account, they do nothing to stop it from springing right back up. According to the New York Times, the Twitter account of the pro- terrorist group Asawitiri Media has had 335 accounts. When its account @TurMedia333 was shut down, it started @TurMedia334. When that was shut down, it started @TurMedia335. This "naming convention — adding one digit to a new account after the last one is suspended — does not seem as if it would require artificial intelligence to spot." Each of these accounts also used the same user photograph of a bearded man's face over and over again. In the hours after the shooting attack in San Bernardino, California on December 2, 2015, @TurMedia335 tweeted: "California, we have already arrived with our soldiers. Decide how to be your end, with knife or bomb."

72. Using this simplistic naming scheme is critical to HAMAS' use of social media. Without a common prefix, it would be difficult for followers of HAMAS' accounts to know the new name of the account.

73. Because of the simplistic renaming scheme, Defendants could easily detect names that are likely to be replacement accounts and delete them almost as soon as they are created.  Yet Defendants have failed to implement such a basic account detection methodology.

74. Furthermore, HAMAS keeps track of the followers of each account.  Once an account is deleted by one of the Defendants and then regenerated, HAMAS uses a bot to contact each of its followers asking them to connect.  This allows HAMAS to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

reconstitute the connections for each account very quickly. Defendants could easily detect such activity but chose not to.

75. Although Defendants proclaim that they do take accounts down including those of HAMAS, Defendants do nothing to keep those accounts down. HAMAS and other nefarious groups are dependent upon having a social media network from which to collect money and conduct terrorist operations including recruitment and radicalization.

76. The following example illustrates how Defendants allow ISIS to quickly construct networks of followers. Although the example is based upon an ISIS follower, this example equally applies to other terrorist organizations, including HAMAS. Below is a posting from twitter captured on June 20, 2016. The individual is named "DriftOne00146" and he proudly proclaims that this is the 146th version of his account. With only 11 tweets, this individual is followed by 349 followers. This is very suspicious activity.

1
2
3
4
5
6
7
8
9
10
11
12
13



14

*Figure 11: DriftOne00146 posting 06/20/2016*

15  77.  The very next day, this individual now has 547 followers with only 3 additional

16      tweets.

17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14



*Figure 12: DriftOne00146 posting June 21, 2016*

15  78.  The next morning, this individual's account was taken down by Twitter.   That

16      afternoon, he was back up as DriftOne0147 with 80 followers.

17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13



*Figure 13: DriftOne0147 posting June 22, 2016*

14   79.   The very next week on June 28, 2016, the same individual was back up as

15        DriftOne150.  Most disturbing is that his posting of #Bangladesh and #Dhaka just

16        three days before the unfortunate ISIS attack in Dhaka, Bangladesh.

17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14



*Figure 14: DriftOne150 posting June 28, 2016*

15   80.   The day after the attacks, he is now DriftOne0151 and he posts pictures of those

16        individuals who conducted the attacks.

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12



*Figure 15: DriftOne0151 posting July 2, 2016*

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

81.   What the above example clearly demonstrates is that there is a pattern that is easily

detectable without reference to the content.   As such, a content-neutral algorithm

could be easily developed that would prohibit the above behavior.   First, there is a

text prefix to the username that contains a numerical suffix.   When an account is

taken down by a Defendant, assuredly all such names are tracked by Defendants.   It

would be trivial to detect names that appear to have the same name root with a

numerical suffix which is incremented.   By limiting the ability to simply create a new

account by incrementing a numerical suffix to one which has been deleted, this will

disrupt the ability of individuals and organizations from using Defendants networks

as an instrument for conducting terrorist operations.

82. Prohibiting this conduct would be simple for Defendants to implement and not impinge upon the utility of Defendants sites.  There is no legitimate purpose for allowing the use of fixed prefix/incremental numerical suffix names.  Preventing the use of these names once a similarly named account would not place a significant burden on Defendants to implement nor would it place any "chilling" effect on the use of Defendants' sites.

83. Sending out large numbers of requests to connect with friends/followers from a newly created account is also suspicious activity.  As shown in the "DriftOne" example above, it is clear that this individual must be keeping track of those previously connected.  When an account is taken down and then re-established, the individual then uses an automated method to send out requests to all those members previously connected.   Thus, accounts for HAMAS and others can quickly reconstitute after being deleted.  Such activity is suspicious on its face.

84. Clearly, it is not normal activity for a newly created account to send out large numbers of requests for friends and followers immediately after creation.  It is further unusual for those connections requests to be accepted in a very short period of time.  As such, this activity would be easy to detect and could be prohibited by Defendants in a content-neutral manner as the content is never considered; only the conduct.

85. Furthermore, limiting the rapidity with which a newly created account can send

requests to friends/followers would not place a significant burden on Defendants to implement.  Once again, such activity is suspicious and suggestive of reconstitution of an account which was deleted by Defendants.  In addition, Defendants could easily track that a newly created account similarly named to one previously taken down is sending out large numbers of requests in a very short period of time.

86. Because the suspicious activity used by HAMAS and other nefarious organizations engaged in illegal activities is easily detectable and preventable and that Defendants are fully aware that these organizations are using their networks to engage in illegal activity demonstrates that Defendants are acting knowingly and recklessly allowing such illegal conduct. HAMAS is dependent on using social media to conduct its terrorist operations.  Limiting HAMAS' ability to rapidly connect and reconnect to supports Thus, Defendants knowing and reckless conduct provides materials support to HAMAS and other nefarious organizations.

87. Notably, while Twitter has now put in place a rule that supposedly prohibits "threats of violence . . . including threatening or promoting terrorism," many ISIS-themed accounts are still easily found on Twitter.com.  To this day, Twitter also permits groups designated by the U.S. government as Foreign Terrorist Organizations to maintain official accounts, including Hamas (@hamasinfo and @HamasInfoEn) and Hizbollah (@almanarnews).

88. On November 17, 2015, the hacking group Anonymous took down several thousand ISIS Twitter accounts.  That an external third party could identify and disrupt ISIS Twitter accounts confirms that Twitter itself could have prevented or substantially limited other terrorist groups' use of Twitter.

## Twitter, Facebook, and Google Profit From Allowing HAMAS to USE THEIR SERVICES

89. Astonishingly, Defendants routinely profit from HAMAS.  Each Defendant places ads on HAMAS postings and derives revenue for the ad placement.

90. These ads are not placed randomly by Defendants.  Instead, they are targeted to the viewer using knowledge about the viewer as well as information about the content being viewed.  The following sites for each Defendant show how targeting works: https://business.twitter.com/en/targeting.html,        https://www.facebook.com/business/a/online-sales/ad-targeting-details,

https://static.googleusercontent.com/media/www.youtube.com/en//yt/advertise/medias/pdfs/targeting-onesheeter-en.pdf.

91. By specifically targeting advertisements based on viewers and content, Defendants are no longer simply passing through the content of third parties.  Defendants are themselves creating content because Defendants exercise control over what advertisement to match with a HAMAS posting.  Furthermore, Defendants' profits

are enhanced by charging advertisers extra for targeting advertisements at viewers based upon knowledge of the viewer and the content being viewed.

92. Not only does Defendant Google profit from HAMAS, it shares some of those revenues with HAMAS. In order for ads to appear associated with a posting on a YouTube video, the poster must create a Google AdSense account. The poster must the register the account for monetization[22].

> ▼ How can my videos make money?
>
> Once your video is submitted and approved for monetization, YouTube will place ads inside or near the video. After you've associated an AdSense account with your YouTube account, you will earn revenue that is generated from the ads. Learn more

93. According to Google, each video must be approved in order for ads to be placed. These videos must meet Googles' terms of service.

> ▼ What types of videos are eligible?
>
> For a video to be eligible, you must own worldwide commercial usage rights to everything in the video and the video must abide by our Terms of Service and Community Guidelines.

94. Videos that are approved generate revenue for both the poster and for Google. Therefore, according to its terms, if there are ads associated with a YouTube video, the video has been approved by Google, Google is earning revenue from each view of that video, and Google is sharing revenue with the poster.

95. With respect to HAMAS, Google has placed ads on HAMAS postings.

---

22 https://www.youtube.com/account_monetization accessed on 5/24/2016.

1
2
3
4
5
6
7
8
9
10
11
12
13



*Figure 16:  HAMAS video on YouTube with ad place by Google*

14
15
16
17
18
19
20

96.  Given that ad placement on videos requires Google's specific approval of the video according to Google's terms and conditions, any video which is associated with advertising has been approved by Google.

21
22
23
24
25
26

97.  Because ads appear on the above video posted by HAMAS, this means that Google specifically approved the video for monetization, Google earned revenue from each view of this video, and Google shared the revenue with HAMAS.  As a result, Google provides material support to HAMAS.

27
28

98.   Twitter also profits from material posted by HAMAS by routinely placing ads.  For example, a view of the account of @hamasGlobalPR on January 10, 2017, shows that Twitter placed an ad for Velveeta and Rotel.  As such, Twitter provides material support to HAMAS and is compensated for the effort.



*Figure 17:  HAMAS post on Twitter with ad placed by Twitter*

99.   Facebook also profits from HAMAS postings.  On January 10, 2016, the following screenshot was collected:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Figure 18: HAMAS post on Facebook with ad placed by Facebook*

100. As such, Facebook provides material support to ISIS and is compensated for the effort.

101. Thus, not only does each Defendant provide material support to HAMAS by allowing ISIS to make use of their social media sites, each Defendant derives revenue from ISIS postings irrespective of the content of HAMAS' postings.

**Defendants Allow for Other Extremism Groups to be Educated and Inspired by HAMAS Through Their Websites**

102. Other extremist groups have been inspired and educated through Hama's use of Defendants' sites.

103. One clear example of this is the manner in which black separatist hate groups have

clearly implemented social material created by HAMAS into its own propaganda and

methodology.

104. When the uprising in Ferguson began in 2014, HAMAS sympathizers and members

reached out to rioters with support and tweeted advice to the protesters on what to do

after getting hit with tear gas.[23]



iv, Shrew Tamer
@Almightylv

"@gazawia: Where I come from, what some call "rioting" we call an uprising #Ferguson #Gaza #Palestine #intifada"

2:00 AM - 14 Aug 2014

---

23 http://www.momentmag.com/22800-2/

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25



26

*Figure 19: Support given to black separatist hate groups by HAMAS*

27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

105.  Additionally, HAMAS has provided the inspiration for the black separatist hate
group propaganda images below. This first image shows a HAMAS member
beheading an individual that was clearly the reference for the second image below
that was used as black separatist hate group propaganda. That propaganda was shared
8195 times from the Facebook Account it was posted to.



1
2
3
4
5
6
7
8
9
10
11
12



Figure 20: A HAMAS beheading and the black separatist hate groups propaganda to kill police inspired by the beheading photo

13
14
15
16

106. This image was also featured in YouTube videos that called for the killing of

officers.

17
18
19
20
21
22
23



Figure 21: The HAMAS inspired art being used by black separatist hate groups on YouTube to promote killing police officers

24
25
26

107. The BDS movement which is tied to HAMAS, as well as Black Separatist groups

27
28

came out with new videos circulating on the Web to bolster the connection between

current goals of Hamas and BLM. One cries out a central theme of "When I see them I see us", implying a connection between Hamas goals and black revolutionaries.[24]

108. One example is the video below which was uploaded by a user named Black-Palestinian Solidarity. [25] Some of those holding this statements up in the video are are convicted terrorists like Rasmeah Odeh who murdered two college boys with a bomb and is fighting deportation from the USA.[26]



*Figure 22: YouTube video featuring a convicted terrorist Rasmeah Odeh preaching for Black Palestinian Solidarity*

---

24 http://www.centerforsecuritypolicy.org/2016/09/23/hamas-and-black-lives-matter-a-marriage-made-in-hell/
25 https://www.youtube.com/watch?v=xsdpg-9cmSw&t=0s
26 http://legalinsurrection.com/2015/03/rasmea-odeh-sentenced-to-18-months-in-prison/#comments;

**Black Separatist Hate Groups Have Been Communicating With HAMAS**

109. On January 9, 2015, Black journalists, artists and organizers representing Ferguson, Black Lives Matter, Black Youth Project 100 (BYP100), and more have joined the Dream Defenders for a 10-day trip to the occupied Palestinian Territories and Israel. Ahmad Abuznaid, Dream Defenders' legal and policy director and a co-organizer of the delegation, said that the goal of the trip was "primarily to allow for the group members to experience and see firsthand the occupation, ethnic cleansing and brutality Israel has levied against Palestinians, but also to build real relationships with those on the ground leading the fight for liberation,"  and that "[i]n the spirit of Malcolm X, Angela Davis, Stokely Carmichael, and many others, we thought the connections between the African American leadership of the movement in the US and those on the ground in Palestine needed to be reestablished and fortified."[27]

110. The delegation also participated in a weekly riot held in the village of B'illin in the "West Bank" by the Arab Palestinians whom they joined to throw rocks and threaten IDF soldiers and police sent there to guard the security fence.[28]

111. In 2016, Pro-Palestinian David Sheen completed a whirlwind tour to ISM and BLM leftist groups across the U.S. receiving housing and support from well-known

---

27 http://www.ebony.com/news-views/dream-defenders-black-lives-matter-ferguson-reps-take-historic-trip-to-palestine#axzz3zje9Kz00
28 http://www.centerforsecuritypolicy.org/2016/09/23/hamas-and-black-lives-matter-a-marriage-made-in-hell/

anarchists and other radicals. [29]

112. In August 2016, the Movement for Black Lives, a coalition of more than 50 Black-led organizations pledged to firmly and consistently stand in solidarity with our Black sisters and brothers in the United States and around the world."   The Palestinian BDS National Committee (BNC) reiterated its support for the growing Black Lives Matter movement. The BNC thanked the Movement for Black Lives "for the powerful words of solidarity in the Invest-Divest section of the platform specifically endorsing boycott, divestment and sanctions (BDS) measures against Israel's occupation and apartheid."[30]

**Both Black Separatist Hate Groups and HAMAS Have Called for the Killing of Police.**

113. On December 15, 2014, protests in New York City appeared to show demonstrators apparently calling for the deaths of police officers, hours before violence on the Brooklyn Bridge marred the massive march in protest of police killings of black men, including Eric Garner on Staten Island.

114. The video, posted on YouTube, shows a few dozen protesters marching down Fifth Avenue at 32nd Street Saturday afternoon. After a few seconds of chanting "Hands

29 http://www.centerforsecuritypolicy.org/2016/09/23/hamas-and-black-lives-matter-a-marriage-made-in-hell/
30 https://electronicintifada.net/blogs/nora-barrows-friedman/palestinians-welcome-movement-black-lives-platform

up, don't shoot," the demonstrators changed their cry, apparently yelling out in unison "What do we want? Dead cops. When do we want it? Now."[31]

115. A few days before 4 officers were shot within a 24 hour period, Austin protesters Chant "What's Better Than 12 Dead Cops? 13 Dead Cops."[32]

116. Additionally, the previously displayed image of a police being beheaded was also featured in social media posts that called for the killing of officers.



31 http://www.nbcnewyork.com/news/local/Eric-Garner-Manhattan-Dead-Cops-Video-Millions-March-Protest-285805731.html ; https://www.youtube.com/watch?v=dj4ARsxrZh8
32 http://bluelivesmatter.blue/austin-protesters-chant-dead-cops/



*Figure 23: Facebook posts encouraging the killing of Police officers.*

117. A 2016 video shot at a 'Black Lives Matter' protest in Portland shows one protest leader imploring others to take violent action by shooting cops or running them over. The footage shows demonstrators holding signs that read "Alton Sterling" and "Philando Castile" while speakers take turns to rally the crowd. The BLM protester stated that "[i]f they go about their burden of whatever they said you're doing, you pull your pistol out and you f**king bust that" and that "[y]ou pull your pistol out and you bust that! Because at the end of the day, it's going to be you against them."[33]

118. MAS leader Khalilah Sabra openly discussed the importance of Muslim support for Black Lives Matter, and urged "revolution." Comparing the situation in the United

---

[33] http://www.infowars.com/video-black-lives-matter-protest-leader-calls-for-shooting-running-over-cops

States to the Muslim Brotherhood-led Arab Spring revolutions, she asked, "We are the community that staged a revolution across the world; if we can do that, why can't we have that revolution in America?"

119. Nihad Awad is the national leader of the Council on American-Islamic Relations (CAIR). CAIR has been identified as a Hamas front by many intelligence leaders in Congress34. Awad urged Muslim Americans to take up the cause of Black Lives Matter: "Black Lives Matter is our matter," he said; "Black Lives Matter is our campaign." He was joined by Khalilah Sabra, another Islamic leader in calling for making the BLM movement the cause of Muslims in the United States ultimately leading to "the revolution."

120. Starting July 1, 2016, a total of 10,704 tweets used the anti-cop hashtag #Fuck12, with a significant spike on the morning of July 6—a day after Alton Sterling was shot dead by police officers in Baton Rouge, Louisiana. According to Urban Dictionary, the "12" specifically refers to narcotics officers. Early on Friday, use of the hashtag to threaten and condemn police continued as events in Dallas unfolded. Some appeared to be using it to celebrate the deaths of the police officers killed in Dallas.   It was also posted on Facebook and Instagram, sometimes alongside pictures of weapons.[35]

---

34 http://www.islamdaily.org/en/charities/6843.judge-due-to-rule-on-holy-land-defense-challenge.htm
35 http://www.vocativ.com/338229/threats-against-police-spiked-before-dallas-police-shootings/

121. Micah Johnson was radicalized, in part, by these organizations calling for the murders of police officers.

**Defendants' Material Support of HAMAS has a Direct Connection to the July 9, 2016, Dallas Police Shootings and is a Proximate Cause**

122. On July 7, 2016, Micah Xavier Johnson ambushed and fired upon a group of police officers in Dallas, Texas, killing five officers and injuring nine others. Two civilians were also wounded.

123. The shooting was the deadliest incident for U.S. law enforcement since the September 11 attacks, surpassing two related March 2009 shootings in Oakland, California and a November 2009 ambush shooting in Lakewood, Washington.

124. The reach of HAMAS has been substantial fueled through their use of Defendants' social media sites which have been used by HAMAS for fundraising activities, recruitment, and radicalization of individuals.  Furthermore, as discussed above, Defendant Google shares advertising revenue with HAMAS.

125. Defendants' sites have been used by HAMAS to conduct terrorist operations, including the Dallas attack and have also been used as a recruitment tool and fundraising tool.

126. On information and belief, Micah Johnson was radicalized, in part, by reviewing postings of HAMAS and other terrorist groups on the internet and Defendants' social

1

media sites.

2

127. This is further substantiated by the Southern Poverty Law Center (SPLC) and news

3

4

outlets reported that Johnson "liked" the Facebook pages of Black Nationalist

5

organizations such as the New Black Panther Party (NBPP), Nation of Islam, and

6

7

Black Riders Liberation Army, three groups which are listed by the SPLC as hate

8

groups.[36]

9

128. Johnson also "liked" the Facebook page of the African American Defense League,

10

11

whose leader, Mauricelm-Lei Millere, called for the murders of police officers across

12

the U.S. following the fatal 2014 shooting of Laquan McDonald. In response to the

13

14

police killing of Alton Sterling, the organization had "posted a message earlier in the

15

week encouraging violence against police"[37]

16

129. HAMAS' used Defendants' sites to radicalize individuals to conduct terrorist

17

18

activities.  Micah Johnson was radicalized by HAMAS's and other Black Separatist

19

Hate Groups' use of Defendants' tools to conduct terrorist operations.

20

21

130. Without the ability to use Defendants' sites as tools to conduct terrorist operations,

22

HAMAS would have substantially less funding, substantially less exposure, and

23

24

would not be able to recruit as many operatives.

25

26

27

28

---

36 https://www.splcenter.org/hatewatch/2016/07/08/dallas-sniper-connected-black-separatist-hate-groups-facebook
37 *Id.*

131. Money raised through the use of Defendants sites was used by HAMAS to conduct terrorist operations including the radicalization of Micah Johnson.

132. Individuals recruited by HAMAS through the use of Defendants sites allowed ISIS to conduct terrorist operations, including the Dallas Police shootings leading to Plaintiff's damages.

133. But for HAMAS' use of Defendants sites to raise funds, recruit, and conduct terrorist operations, HAMAS' ability to conduct terrorist operations would essentially evaporate. Here, had Defendants sites not been used by HAMAS, and other Black Separatist Hate Groups, Micah Johnson would not have been radicalized and the deadly attack in Dallas would not have occurred.

134. Plaintiff Demetrick Pennie was one of the first responders from the Dallas Police to the shooting scene. He knew the officers wounded and killed individually and personally. To this day, he suffers severe emotional distress reliving the horrific scene. Furthermore, as a result of postings from HAMAS and other radical groups, Pennie receives threats of death and bodily harm on a frequent basis.

## **Defendants Are Information Content Providers**

135. When individuals look at a page on one of Defendants' sites that contain postings and advertisements, the page has been created by Defendants. In other words, a

viewer does not simply see a posting.  Nor does the viewer see just an advertisement. Defendants create a composite page of content from multiple sources.

136. Defendants create this page by selecting which advertisement to match with the content on the page.  This selection is done by Defendants' proprietary algorithms that select the advertisement based on information about the viewer and the content being viewed.  Thus there is a content triangle matching postings, advertisements, and viewers.

137. As discussed above, Defendants tout the ability to target advertisements as a benefit to advertising with the respective networks.  Furthermore, Defendants extract a premium from advertisers for the use of targeted advertising.

138. Although Defendants have not created the posting nor have they created the advertisement, Defendants have created new unique content by choosing which advertisement to combine with the posting with knowledge about the viewer.

139. Thus, Defendants have incorporated content from others into Defendant created content for revenue purposes.  Defendants' choice to combine certain advertisements with certain postings for specific viewers means that Defendants are not simply passing along content created by third parties.

140. Specifically, as shown above, Defendants have incorporated HAMAS' postings along with advertisements matched to the viewer and HAMAS postings to create new content for which Defendants have earned revenue.  HAMAS has received material support as described above allowing them to conduct terrorist operations.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### LIABILITY FOR AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a) and (d)

141. Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

142. Since October 31, 2001, HAMAS has been international terrorist organization.

143. HAMAS has committed, planned, or authorized activities that involved violence or acts dangerous to human life that are a violation of the criminal laws of the United States, or that would be a criminal violation if committed within the jurisdiction of the United States, including *inter alia* the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

144. These activities committed, planned, or authorized by HAMAS appear to have been, and were intended to: (a) intimidate or coerce the civilian population of the United States and other countries; (b) influence the policy of the Governments of the United States and other countries by intimidation or coercion; or (c) affect the conduct of the Governments of the United States and other countries by mass destruction, assassination, or kidnapping.

145. These activities committed, planned, or authorized by HAMAS occurred entirely or primarily outside of the territorial jurisdiction of the United States and constituted acts of international terrorism as defined in 18 U.S.C. § 2331(1).

146. Plaintiffs has been injured in their person by reason of the acts of international terrorism committed, planned, or authorized by HAMAS. At all times relevant to this action, Defendants knew that HAMAS was a Foreign Terrorist Organization, that it had engaged in and continued to engage in illegal acts of terrorism, including international terrorism.

147. Defendants knowingly provided substantial assistance and encouragement to HAMAS, and thus aided and abetted HAMAS in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured plaintiff.

148. By aiding and abetting HAMAS in committing, planning, or authorizing acts of international terrorism, including acts that caused plaintiff to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

149. The services and support that Defendants purposefully, knowingly or with willful blindness provided to ISIS constitute material support to the preparation and carrying out of acts of international terrorism, including the attack in which Nohemi Gonzalez was killed.

150. Defendants' provision of material support to ISIS was a proximate cause of the injury inflicted on Plaintiff.

151. By virtue of its violations of 18 U.S.C. § 2339A, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiff has sustained.

## SECOND CLAIM FOR RELIEF

### LIABILITY FOR CONSPIRING IN FURTHERANCE OF ACTS OF INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a) and (d)

152. Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

153. Defendants knowingly agreed, licensed, and permitted HAMAS its affiliates, and other radical groups to register and use Defendants' sites to promote and carry out HAMAS's activities, including HAMAS's illegal acts of international terrorism and injured plaintiff.

154. Defendants were aware that U.S. federal law prohibited providing material support and resources to, or engaging in transactions with, designated foreign terrorist organizations and other specially designated terrorists.

155. Defendants thus conspired with HAMAS in its illegal provision of Defendants' sites to promote and carry out HAMAS's illegal acts of international terrorism, including the acts that injured plaintiff.

156. By conspiring with HAMAS in furtherance of HAMAS's committing, planning, or authorizing acts of international terrorism, including acts that caused each of the plaintiffs to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

**THIRD CLAIM FOR RELIEF**

**PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339a AND 18 U.S.C. § 2333**

157. Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

158. The online social media platform and communication services which Defendants knowingly provided to HAMAS, including use of Defendants' services, computers, and communications equipment, substantially assisted HAMAS in carrying out its terrorist activities, including recruiting, radicalizing, and instructing terrorists, raising funds, creating fear and carrying out attacks among other things.

159. These services and equipment constituted material support and resources pursuant to 18 U.S.C. § 2339A, and they facilitated acts of terrorism in violation of 18 U.S.C. § 2332 that caused the deaths of 5 police officers (4 from Dallas Police and 1 Dart Police) and injured 9 other officers by gunfire and the identified injuries to plaintiff.

160. Defendant provided these services and equipment to HAMAS, knowing that they were to be used in preparation for, or in carrying out, criminal acts including the acts that injured the plaintiff.

161. As set forth more fully above, but for the material support and resources provided by HAMAS, the attack that injured the plaintiffs would have been substantially more difficult to implement.

162. By participating in the commission of violations of 18 U.S.C. § 2339A that have caused the plaintiffs to be injured in his or her person, business or property, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiff has sustained as a result of such injuries.

**FOURTH CLAIM FOR RELIEF**

**PROVISION OF MATERIAL SUPPORT AND RESOURCES TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)**

163. Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

164. By knowingly (or with willful blindness) providing their social media platforms and communications services, including use of computer and communications equipment, for the benefit of HAMAS, Defendants have provided material support and resources to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C § 2339B(a)(1).

165. Defendants knew of (or was willfully blind to) HAMAS' terrorist activities.

166. Defendants knew (or was willfully blind to the fact) that HAMAS had been designated a Foreign Terrorist Organization by the United States Government.

167. Defendants' violation of 18 U.S.C. § 2339B proximately caused the damages to plaintiff described herein.

168. By knowingly (or with willful blindness) providing material support to a designated Foreign Terrorist Organization, Defendants are therefore civilly liable for damages to Plaintiff for his injuries pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

169. Plaintiff repeats and realleges each of the foregoing allegations with the same force and effect as if more fully set forth herein.

170. Defendants engaged in negligent behavior by providing services to HAMAS.

171. Defendants' acts of providing services to HAMAS constituted a willful violation of federal statutes, and thus amounted to a willful violation of a statutory standard.

172. As a direct, foreseeable and proximate result of the conduct of Defendants as alleged hereinabove, Plaintiff has suffered severe emotional distress, and therefore Defendants are liable to the plaintiffs for Plaintiff's severe emotional distress and related damages.

## PRAYER FOR RELIEF

173. WHEREFORE, Plaintiff requests that the Court:

    a)  Accept jurisdiction over this action;

b) Enter judgment against Defendants and in favor of Plaintiff for compensatory damages on all claims in an amount to be determined at trial;

c) Enter judgment against Defendants and in favor of Plaintiff for treble damages pursuant to 18 U.S.C. § 2333;

d) Enter judgment against Defendants and in favor of Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

e) Order any equitable relief to which Plaintiff might be entitled;

f) Enter an Order declaring that Defendants has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*; and

g) Grant such other and further relief as justice requires.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Date: January 17, 2017

EXCOLO LAW, PLLC
By: */s Keith L. Altman*
Attorney for Plaintiffs
Email: kaltman@lawampmmt.com

Keith L. Altman, SBN 257309
Solomon Radner (*pro hac vice*)
26700 Lahser Road, Suite 401
Southfield, MI 48033

1

Telephone:   (516) 456-5885

2

**1-800-LAW-FIRM, PLLC**

3

Ari Kresch (*pro hac vice pending*)

4

26700 Lahser Road, Suite 400
Southfield, MI 48033

5

(800) 529-3476

6

Email: akresch@1800lawfirm.com

7

*Attorneys for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4

## **VERIFICATION**

I, the undersigned, certify and declare that I have read the foregoing complaint, and know its contents.

5
6
7
8
9

I am the attorney for Plaintiffs to this action. Such parties are absent from the county where I have my office and is unable to verify the document described above. For that reason, I am making this verification for and on behalf of the Plaintiffs. I am informed and believe on that ground allege the matters stated in said document are true.

10
11
12
13
14

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 17, 2016, at Los Angeles, CA.

15
16
17
18
19
20

Respectfully Submitted,

**EXCOLO LAW, PLLC**

By: */s Keith L. Altman*
Attorney for Plaintiffs
Email: kaltman@lawampmmt.com

21
22
23
24
25
26
27
28

Keith L. Altman, SBN 257309
26700 Lahser Road, Suite 401
Southfield, MI 48033
Telephone:   (516) 456-5885