1   SETH P. WAXMAN (*pro hac vice*)
    seth.waxman@wilmerhale.com
2   PATRICK J. CAROME (*pro hac vice*)
    patrick.carome@wilmerhale.com
3   ARI HOLTZBLATT (*pro hac vice*)
    ari.holtzblatt@wilmerhale.com
4   WILMER CUTLER PICKERING
       HALE AND DORR LLP
5   1875 Pennsylvania Avenue, NW
    Washington, D.C. 20006
6   Telephone:  (202) 663-6000
    Facsimile:  (202) 663-6363
7
8   *Attorneys for Defendant*
    **TWITTER, INC.**
9
10  [Additional counsel for each defendant are
    included on the signature page.]
11

    DAVID H. KRAMER (CA SBN 168452)
    dkramer@wsgr.com
    LAUREN GALLO WHITE (CA SBN 309075)
    lwhite@wsgr.com
    WILSON SONSINI
       GOODRICH & ROSATI, P.C.
    650 Page Mill Road
    Palo Alto, CA  94304
    Telephone:  (650) 493-9300
    Facsimile:  (650) 565-5100

    *Attorneys for Defendant*
    **GOOGLE INC.**

    KRISTIN A. LINSLEY (CA SBN 154148)
    klinsley@gibsondunn.com
    JEANA BISNAR MAUTE (CA SBN 290573)
    jbisnarmaute@gibsondunn.com
    SHELI R. CHABON (CA SBN 306739)
    schabon@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
    555 Mission Street, Suite 3000
    San Francisco, CA 94105-0921
    Telephone:  (415) 393-8200
    Facsimile:  (415) 393-8306

    *Attorneys for Defendant*
    **FACEBOOK, INC.**

12
13
14
15
16

**UNITED STATES DISTRICT COURT**

17

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

18
19

| | |
|---|---|
| DEMETRICK PENNIE, RICK ZAMARRIPA | Case No. 3:17-CV-00230-JCS |
| Plaintiffs, | **NOTICE OF MOTION AND MOTION OF DEFENDANTS TWITTER, INC., GOOGLE INC., AND FACEBOOK, INC. TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| TWITTER, INC., GOOGLE INC., FACEBOOK INC., | |
| Defendants. | Judge:  Hon. Joseph C. Spero |
| | [Fed. R. Civ. P. 12(b)(6)] |
| | Hearing Date:  Aug. 25, 2017 |

20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

NOTICE OF MOTION AND MOTION ................................................................................. 1

STATEMENT OF REQUESTED RELIEF ............................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ..................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

FACTUAL BACKGROUND ................................................................................................. 4

LEGAL STANDARDS ON A MOTION TO DISMISS ........................................................ 7

ARGUMENT ......................................................................................................................... 8

I.      Section 230 Requires Dismissal Of All Of Plaintiffs' Claims ................................. 8

        A.      Section 230 Immunizes Interactive Service Providers From
                Liability For Third-Party Content .............................................................. 8

        B.      Plaintiffs' Claims Meet All Elements Of § 230 Immunity ........................ 9

                1.      Defendants Provide "Interactive Computer Services" ................. 10

                2.      Third Parties Provided The Allegedly Harmful Content
                        Underlying Plaintiffs' Claims ...................................................... 10

                3.      Plaintiffs' Claims Seek To Treat Defendants As Publishers ...... 12

II.     All Of Plaintiffs' Claims Also Fail On Their Own Terms ..................................... 15

        A.      The FAC Fails To Allege Facts Plausibly Establishing Proximate Cause
                (Counts III-IV) ......................................................................................... 15

        B.      Plaintiffs' Secondary Liability Claims Fail (Counts I-II) ....................... 19

                1.      The Dallas Shooting Was Not An Act Of "*International
                        Terrorism*" .................................................................................. 19

                2.      Plaintiffs Fail To Allege Facts Establishing That Hamas
                        Committed, Planned, Or Authorized The Dallas Shooting .......... 21

                3.      The FAC Fails To Allege Facts Establishing That
                        Defendants Aided And Abetted Or Conspired With
                        Johnson ....................................................................................... 22

        C.      Plaintiff Pennie Has Not Pled A Cognizable Injury (All Counts) .......... 24

III.    The FAC Should Be Dismissed With Prejudice ..................................................... 25

CONCLUSION .................................................................................................................... 25

ATTORNEY ATTESTATION

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Al Haramain Islamic Found. v. Dep't of Treasury*,
    686 F.3d 965 (9th Cir. 2012) ........................................................19

*AmerisourceBergen Corp. v. Dialysist West, Inc.*,
    465 F.3d 946 (9th Cir. 2006) ........................................................25

*Arkansas Educ. Telev. Comm'n v. Forbes*,
    523 U.S. 666 (1998)........................................................................18

*Ascentive, LLC v. Opinion Corp.*,
    842 F. Supp. 2d 450 (E.D.N.Y. 2011) ........................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................8, 16, 21

*Bank of Am. Corp. v. City of Miami, Fl.*,
    Nos. 15-1111, 15-1112, 2017 WL 1540509 (U.S. May 1, 2017) ....................16

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ...........................................2, 10, 13

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ...........................................................9

*Biton v. Palestinian Interim Self-Government Auth.*,
    310 F. Supp. 2d 172 (D.D.C. 2004).............................................25

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) (en banc) .....................................16

*Boim v. Quranic Literacy Inst.*,
    291 F.3d 1000 (7th Cir. 2002) ......................................................24

*Campos v. Ysleta Gen. Hosp.*,
    836 S.W.2d 791 (Tex. App. 1992)................................................16

*Caraccioli v. Facebook, Inc.*,
    167 F. Supp. 3d 1056 (N.D. Cal. 2016) ..................................9, 13

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) .............................................9, 11, 12

*Cohen v. Facebook, Inc.*,
  2017 WL 2192621 (E.D.N.Y. May 18, 2017) ....................................................3, 9, 13, 14

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) ..................................................................................7

*Couch v. Cate*,
  379 F. App'x 560 (9th Cir. 2010) ...........................................................................16

*Doe v. Backpage.com, LLC*,
  817 F.3d 12 (1st Cir. 2016).......................................................................................9

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016) ....................................................................................9

*Doe v. MySpace, Inc.*,
  528 F.3d 413 (5th Cir. 2008) ..................................................................................13

*Erlich v. Menezes*,
  21 Cal. 4th 543, 555 (1999) ....................................................................................16

*Estates of Ungar v. Palestinian Auth.*,
  304 F. Supp. 2d 232 (D.R.I. 2004).........................................................................24

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) (en banc) ..................................2, 8, 9, 11, 12, 25

*Fields v. Twitter, Inc.*,
  200 F. Supp. 3d 964 (N.D. Cal. 2016) ..............................3, 9, 10, 13, 14, 16, 18

*Fields v. Twitter, Inc.*,
  2016 WL 6822065 (N.D. Cal. Nov. 18, 2016) ......................3, 9, 13, 14, 16, 18

*Freeman v. City of Pasadena*,
  744 S.W.2d 923 (Tex. 1988)...................................................................................24

*Gilbrook v. City of Westminster*,
  177 F.3d 839 (9th Cir. 1999) ..................................................................................24

*Goddard v. Google, Inc.*,
  No. C 08-2738, 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ....................11, 13

*Goldberg v. UBS AG*,
  660 F. Supp. 2d 410 (E.D.N.Y. 2009) ...................................................................25

*Gonzalez v. Twitter*,
  No. 4:16-CV-03282 (N.D. Cal.) ...............................................................................5

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ..........................................................22, 23, 24

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ...............................................................................16

*Hinton v. Amazon.com.dedc, LLC*,
    72 F. Supp. 3d 685 (S.D. Miss. 2014) .................................................11

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ...............................................................................19

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) ...........................................................................16

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .........................................................8, 17

*In re Splash Tech. Holdings, Inc.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ..............................................25

*In re Terrorist Attacks on Sept. 11, 2001*,
    349 F. Supp. 2d 765, 831 (S.D.N.Y. 2005),
    *aff'd*, 714 F.3d 118 (2d Cir. 2013) ......................................................8

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 118 (2d Cir. 2013)......................................................3, 16, 18

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) ..............................................................11

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) ..............................................................8

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) .....................................................8, 9, 12

*Lancaster v. Alphabet Inc.*,
    No. 15-CV-05299-HSG, 2016 WL 3648608 (N.D. Cal. July 8, 2016) ............10

*Lelchook v. Commerzbank AG*,
    2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011)........................................24

*Levitt v. Yelp! Inc.*,
    2011 WL 5079526 (N.D. Cal. Oct. 26, 2011),
    *aff'd*, 765 F.3d 1123 (9th Cir. 2014)...................................................12

*Linde v. Arab Bank, PLC*,
   97 F. Supp. 3d 287 (E.D.N.Y. 2015), *appeal pending*, 2d Cir. No. 16-2134 ...................16

*M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*,
   809 F. Supp. 2d 1041 (E.D. Mo. 2011)......................................................................11, 13

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) .........................................................................................8

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015)..................................................................................................14

*Rivera v. BAC Home Loans Servicing*,
   756 F. Supp. 2d 1193 (N.D. Cal. 2010) ........................................................................25

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)................................................................................8, 16, 18

*Shrader v. Beann*,
   503 F. App'x 650 (10th Cir. 2012) ................................................................................13

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
   144 F. Supp. 3d 1088 (N.D. Cal. 2015) ........................................................................10

*Smith v. Islamic Emirate of Afghanistan*,
   262 F. Supp. 2d 217 (S.D.N.Y. 2003)...........................................................................20

*Turner Broad. Sys. v. FCC*,
   512 U.S. 622 (1994)......................................................................................................18

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
   478 F.3d 413 (1st Cir. 2007)........................................................................................13

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) .......................................................................................8, 9

## STATUTES AND RULES

Immigration and Nationality Act, 8 U.S.C. § 1189 ...................................................19

Clayton Act, 15 U.S.C. § 15 .....................................................................................16

RICO, 18 U.S.C. § 1964 ...........................................................................................16

18 U.S.C.
   § 2331.....................................................................................................................20
   § 2333........................................................................................................... *passim*
   § 2339A.....................................................................................................................7
   § 2339B.....................................................................................................................7

Communications Decency Act, 47 U.S.C. § 230...............................................................*passim*

Sherman Act, 26 Stat. 209 (1890).............................................................................16

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222..........................................19, 22

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 7

## OTHER AUTHORITIES

H.R. Rep. No. 102-1040 (1992)................................................................................21

Restatement (Second) of Torts ..............................................................................23, 24

Facebook Community Standards,
       https://www.facebook.com/communitystandards#.............................................................7

The Twitter Rules,
        https://support.twitter.com /articles/18311# ...................................................................6

YouTube Community Guidelines,
       https://www.youtube.com/yt/ policyandsafety/communityguidelines.html ........................7

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on August 25, 2017, at 9:30 a.m. in the U.S. District Court for the Northern District of California, Courtroom G, 450 Golden Gate Ave., San Francisco, California, Defendants Twitter, Inc., Google Inc., and Facebook, Inc. (collectively "Defendants") shall and hereby do move for an order dismissing with prejudice all claims advanced in the First Amended Complaint ("FAC").

## STATEMENT OF REQUESTED RELIEF

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants request that the Court dismiss with prejudice all of Plaintiffs' claims.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether the immunity for online intermediaries created by § 230 of the Communications Decency Act, 47 U.S.C. § 230 ("§ 230"), bars this action, which seeks to impose liability based on allegations that Defendants failed to block or remove content that third parties allegedly transmitted or posted through Defendants' interactive computer services.

2. Whether Plaintiffs fail to state a claim under the civil remedy provision of the Anti-Terrorism Act, 18 U.S.C. § 2333(a), (d) ("ATA"), because they fail to allege facts that would establish that any Defendant (a) proximately caused Plaintiffs' alleged injuries (Counts III-IV) or (b) knowingly provided substantial assistance to, or conspired with, Micah Johnson, the "person who committed" the alleged terrorist acts at issue (Counts I-II); or that (c) Plaintiff Pennie suffered a cognizable injury (Counts I-IV).

3. Whether Plaintiffs fail to state a claim for negligent infliction of emotional distress (Count V) because they fail to plead a cognizable injury or proximate causation.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs claim to have suffered emotional distress resulting from the fatal shooting of five police officers in Dallas, Texas in July 2016. Rather than suing the shooter's estate, or even any of the individuals or groups that Plaintiffs allege inspired the shooter's crime, Plaintiffs in this suit have chosen to sue three companies—Defendants Twitter, Google, and Facebook—that provide broadly available online services used by billions of people around the world. In an

effort to link the Defendants to the shooting (and to Plaintiffs' alleged emotional distress), the FAC posits an elaborate and far-fetched chain reaction:  (1) Plaintiffs experienced emotional distress; (2) as a result of the shootings by Micah Johnson of police officers in Dallas; (3) Johnson allegedly was prompted to commit that shooting because he was "radicalized" by viewing webpages created by individuals and groups that the FAC labels "black separatist hate groups," including Black Lives Matter; (4) some of these so-called "black separatist hate groups" allegedly advocated the killing of police officers in retaliation for incidents of police violence; (5) some "black separatist hate groups" allegedly were inspired by Hamas, a designated terrorist organization in the Middle East, and other "pro-Palestinian" groups; and (6) Hamas and its supporters allegedly were provided "material support" by Defendants because they allegedly used Defendants' broadly available online services to transmit content promoting their views and agenda.  Plaintiffs assert that this attenuated chain of causation renders Defendants directly and secondarily liable for Plaintiffs' alleged emotional injuries under the civil remedy provision of the federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), (d), and under the state law tort of negligent infliction of emotional distress.

Defendants have profound sympathy for those affected by the Dallas shooting and are committed to combating the spread of terrorist content online.  But even assuming any such content somehow contributed to Micah Johnson's motivations (a proposition not plausibly alleged in the Amended Complaint), Defendants are not liable for the consequences of his crime. Two overarching flaws render Plaintiffs' claims legally baseless.

*First*, Plaintiffs' claims are barred by § 230 because they attempt to hold Defendants liable for the alleged effects of third-party content posted on Defendants' online platforms.  The Ninth Circuit repeatedly has held that § 230(c)(1) immunizes online service providers from liability for performing "traditional editorial functions" relating to third-party content, such as disseminating or failing to remove objectionable content created by their users.  *E.g.*, *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1184 (9th Cir. 2008) (en banc); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).  Here, Plaintiffs' claims all turn on the theory that third-party content published through Defendants' online services—

specifically, content created and transmitted by Hamas or its sympathizers—indirectly caused the Dallas shooting.   As Judge Orrick in this District and Judge Garaufis in the Eastern District of New York have correctly concluded in dismissing similar claims filed against Twitter and Facebook, such a theory would improperly impose liability on Defendants for "deciding whether to publish" other people's information—precisely the result that § 230 forbids.  *Fields v. Twitter, Inc.*, 2016 WL 6822065, at *5 (N.D. Cal. Nov. 18, 2016) ("*Fields II*"); *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016) ("*Fields I*"); *Cohen v. Facebook, Inc.*, 2017 WL 2192621, at *12-13 (E.D.N.Y. May 18, 2017).

  *Second*, Plaintiffs fail to allege facts necessary for the essential elements of their claims. Their claims for direct liability under § 2333(a) of the ATA (Counts III-IV) and their state law claims for negligent infliction of emotional distress (Count V) fail because their allegations do not establish that Plaintiffs' alleged injuries were proximately caused by some unlawful act committed by the Defendants, as both legal theories require.  *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123-25 (2d Cir. 2013) ("*Al Rajhi*").  Plaintiffs' convoluted story— purportedly linking Defendants' provision of broadly available online services; to the alleged use of those services by Hamas sympathizers; to a claimed connection between Hamas (and other pro-Palestinians groups), on the one hand, and "black separatist hate groups" (including Black Lives Matter), on the other; to a purported causal link between statements by those groups and Micah Johnson's heinous acts in Dallas; and, finally, to emotional injuries Plaintiffs allegedly suffered as a result of the shooting—is far "too speculative [and] attenuated to raise a plausible inference of proximate causation."  *Fields II*, 2016 WL 6822065, at *10 n.3.  Chaos theory may entertain the possibility that a butterfly flapping its wings in China could cause a hurricane in the Gulf of Mexico, but the doctrine of proximate cause does not.

  Plaintiffs' claims for aiding and abetting and conspiracy under § 2333(d) of the ATA (Counts I-II) also fail to state a claim because Plaintiffs have not pled, and cannot plead, that Defendants aided and abetted or conspired with "the person who committed" the alleged "act of international terrorism" from which Plaintiffs' injury allegedly arose.  Here, that person was Micah Johnson, and there are no plausible allegations that Defendants knowingly provided

substantial assistance to Johnson or entered into an unlawful agreement with him—or with anyone else, including Hamas or any so-called "black separatist hate groups"—regarding the Dallas shootings.  Nor was the Dallas shooting an act of "international terrorism," as required by the ATA.  It was a crime committed on U.S. soil by a former U.S. soldier against U.S. victims, apparently in response to shootings of black men by police officers in the United States.  Section 2333(d) does not apply to such purely domestic events.

Finally, all of Plaintiff Pennie's claims fail because he was not physically injured in the Dallas shooting and his theories of liability permit recovery for emotional distress only by a plaintiff who was both present during the attack and an immediate family member of a victim.

For these reasons, as in *Fields* and *Cohen*, the FAC in this case must be dismissed.  And because the defects identified cannot be cured (and were not cured by Plaintiffs' recently amended complaint), dismissal should be with prejudice.

## FACTUAL BACKGROUND

According to the FAC, Micah Johnson shot and killed five police officers and injured nine other police officers and two civilians in Dallas on July 7, 2016.  FAC ¶¶ 1, 123.  The FAC describes Johnson as an independent actor who allegedly became "radicalized" by viewing Facebook pages of "[b]lack [n]ationalist" organizations.  *Id.* ¶¶ 130-132.  The FAC also contains conclusory allegations that Johnson was "radicalized, in part, by reviewing postings of Hamas and other terrorist groups on the internet and Defendants' social media sites."  *Id.* ¶¶ 129, 132.  Plaintiff Rick Zamarripa is the father of one of Johnson's victims.  *Id.* ¶ 1, 9.  Plaintiff Demetrick Pennie alleges that he is a police officer who "knew the officers wounded and killed," was one of the first responders to the scene after the shootings, and allegedly "suffers severe emotional distress reliving the horrific scene."  *Id.* ¶¶ 1, 137.

Defendants Twitter, Google (through its YouTube service), and Facebook each operates a global Internet platform for public self-expression and conversation that is free of charge and broadly available for use.  *See* FAC ¶ 1.  Each day, users of these platforms send and share hundreds of millions of posts, Tweets, videos, and messages touching on a broad range of topics—from political commentary to a favorite sports team to the birth of a child.  *See id.* ¶ 68.

Plaintiffs do not allege that any Defendant committed the Dallas shootings or assisted Johnson in committing them.  Instead, they conjure up a series of tenuous connections purporting to link Johnson's crime to content allegedly posted on Defendants' services by Hamas.  The alleged involvement of Hamas, a group based in the Middle East that the U.S. government has formally designated a "foreign terrorist organization," provides the purported hook for Plaintiffs' claims under the Anti-Terrorism Act, because the Act allows claims only for injuries caused by an "act of international terrorism."  Hamas is the only individual or group that Plaintiffs attempt to connect even indirectly to Johnson that has been designated a foreign terrorist organization.[1]

The FAC sets forth an elaborate construct to try to tie Defendants to Hamas and then Hamas to Plaintiffs' alleged injuries.  It first alleges that the shooter, Micah Johnson, viewed (and "liked") the Facebook pages of various "black separatist hate groups"—a term the FAC uses to lump together a disparate collection of groups and individuals, including "Black journalists, artists and organizers representing Ferguson, Black Lives Matter, Black Youth Project 100," groups that the Southern Poverty Law Center has deemed "hate groups," and individuals that have called for the murder of police.  FAC ¶¶ 110, 114-121, 130-131.  According to the FAC, Johnson was "radicalized" "in part" by viewing some of those groups' webpages and thereby was inspired to carry out his shooting.  *Id.* ¶¶ 122, 129.

Next, the FAC posits a further (and even more tenuous) link between so-called "black separatist hate groups" in the United States, and Hamas—alleging that Hamas and other "pro-Palestinian" groups "inspired," and expressed "solidarity" with, the "black separatist hate group[s]."  FAC ¶¶ 103-113.  The lone factual allegation that the FAC offers to try to show some

---

[1] Many allegations of the FAC—copied from the complaints in *Gonzalez v. Twitter*, No. 4:16-CV-03282 (N.D. Cal.), which were themselves copied from complaints in *Fields*—describe the alleged use of Defendants' platforms not by Hamas but by a different terrorist organization, ISIS, whose alleged content was at issue in those cases.  *E.g.*, FAC ¶¶ 2, 3, 26, 50, 51 & n.14, 52 & n.15, 68, 77-80, 88, 89, 101-102, 135, 164-165.  These errant and irrelevant remnants—which Plaintiffs failed to fix even after Defendants' prior motion flagged them—expose Plaintiffs' careless and haphazard pleading.  The FAC also engages in improper "group pleading"— asserting broad claims against "Defendants" when the factual allegations allegedly supporting the point relate only to a single defendant.

inspirational link between Hamas and U.S.-based "black separatist hate groups" is a single piece of alleged "HAMAS inspired art" (portraying an imagined beheading of a white policeman by an unidentifiable person cloaked entirely in black) that an unspecified "black separatist hate group" allegedly used as "black separatist hate group propaganda." *Id.* ¶¶ 106, 107, 117, & fig. 21.  The FAC does not allege that Micah Johnson ever saw that "art" or, for that matter, anything else created by any "hate group" that allegedly disseminated it.  The FAC also points to expressions of "solidarity" from groups and individuals allegedly "tied" to Hamas and meetings that "Black journalists, artists, and organizers representing" Black Lives Matter and others allegedly held with "Pro-Palestinian" individuals (although not Hamas itself).  *Id.* ¶¶ 108-113.  The FAC does not allege that Hamas or any of its proponents planned, authorized, funded, committed, or even claimed credit for Johnson's crime.

Finally, the FAC attempts to link Defendants to this attenuated chain of connections by alleging that among the billions of persons who used Defendants' online services were some individuals who used those platforms to transmit content promoting Hamas's activities and/or agenda.  FAC ¶¶ 25-29, 34-40, 42, 45-46, 88, 100.  According to the FAC, Defendants "knowingly and recklessly" allowed Hamas and its supporters to share this objectionable content and allegedly failed to take "meaningful action to stop" Hamas by "censor[ing] user content," "shut[ting] down … [Hamas]-linked account[s]," or blocking Hamas-related accounts from "springing right back up."  FAC ¶¶ 1, 43, 53, 69, 72; *see also id.* ¶¶ 55, 63, 76.  The FAC acknowledges that each Defendant has rules regarding types of content that are prohibited on their platforms.  *Id.* ¶¶ 69, 76, 94.  Those rules unequivocally ban content that threatens violence of any kind, including terrorism.[2]  Plaintiffs nonetheless allege that Defendants did not do

---

[2] Twitter has always banned "threats" and use of the platform "for any unlawful purposes or in furtherance of illegal activities" and, for the sake of clarity, has since April 2015 made the ban on terrorist content more explicit by expressly prohibiting "threats of violence … including threatening or promoting terrorism."  The Twitter Rules, *available at* https://support.twitter.com /articles/18311# (last visited June 23, 2017).  YouTube removes "videos that encourage others to do things that might cause them to get badly hurt," "gory content that … encourage[s] others to commit specific acts of violence," content "inciting others to commit violent acts," and promotions of "violence against individuals or groups based on race or ethnic origin, religion, …

enough to enforce these rules and that, instead of reviewing and removing content and blocking accounts when notified of a violation (*id.* ¶¶ 55, 69), Defendants should have "proactively" "monitor[ed]" hundreds of millions of tweets, posts, videos, and other content transmitted via their platforms each day (*id.* ¶ 69), and pre-emptively "delete[d]" accounts of Hamas or its sympathizers "as soon as they [were] created" (*id.* ¶¶ 65, 74). The FAC asserts that because Defendants allegedly failed to take these steps, they provided "material support" to Hamas and thereby became civilly liable for all injuries that can somehow be traced back to Hamas's activities—including, supposedly, the emotional injuries that Plaintiffs allegedly suffered as a result of Johnson's shooting in Dallas.

Based on these allegations, Plaintiffs seek treble damages under the ATA and recovery under state law for emotional distress they attribute to the Dallas shooting. Counts I and II seek to hold Defendants secondarily liable under § 2333(d) on the theory that Defendants knowingly provided substantial assistance to, and conspired with, Hamas. Count III seeks to hold Defendants directly liable under § 2333(a) on the theory that Defendants provided "material support" to Hamas in violation of 18 U.S.C. § 2339A, and that, "but for" that support, the attack "would have been substantially more difficult to implement." FAC ¶¶ 172-177. Count IV also asserts direct liability under § 2333(a) on a material support theory, relying on 18 U.S.C. § 2339B. Finally, Count V asserts a state law claim for negligent infliction of emotional distress.

## LEGAL STANDARDS ON A MOTION TO DISMISS

Rule 12(b)(6) requires dismissal where a complaint fails to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

[or] nationality." YouTube Community Guidelines, https://www.youtube.com/yt/policyandsafety/communityguidelines.html (last visited June 23, 2017). Facebook bars organizations engaged in "terrorist activity," and "remove[s] content that expresses support for groups that are involved in the violent or criminal behavior," including content "[s]upporting or praising leaders of those same organizations, or condoning their violent activities." Facebook Community Standards, *available at* https://www.facebook.com/communitystandards# (last visited June 23, 2017). These rules are incorporated by reference into the Complaint because it "necessarily relies upon" and quotes portions of them (FAC ¶¶ 69, 76, 94), there is no basis to question their authenticity, and they are relevant. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

556 U.S. 662, 678 (2009) (internal quotation marks omitted).  The court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008).

Section 230 requires dismissal where its applicability "is evident from the face of the complaint."  *Klayman v. Zuckerberg,* 753 F.3d 1354, 1357 (D.C. Cir. 2014); *see also Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016).  Because § 230 protects online service providers not only from "ultimate liability," but also from "having to fight costly and protracted legal battles," *Roommates*, 521 F.3d at 1175, the immunity must be resolved "at the earliest possible stage of the case," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com*, 591 F.3d 250, 255 (4th Cir. 2009).

Given the extreme nature of a claim of terrorism, the court in an action under the ATA, as a matter of fairness, should give "extra-careful scrutiny" to plaintiffs' allegations.  *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 831 (S.D.N.Y. 2005), *aff'd*, 714 F.3d 118 (2d Cir. 2013); *accord Rothstein v. UBS AG*, 708 F.3d 82, 93-98 (2d Cir. 2013).

## ARGUMENT

## I.   Section 230 Requires Dismissal Of All Of Plaintiffs' Claims

Section 230 provides immunity to "interactive computer service" providers from claims deriving from third-party content available on their sites or from their performance or non-performance of "editorial functions" regarding such content.  This sweeping federal immunity bars all of Plaintiffs' claims, which seek to impose liability based on content allegedly posted on Defendants' platforms by Hamas or its sympathizers.

### A.   Section 230 Immunizes Interactive Service Providers From Liability For Third-Party Content

The broad scope of § 230 is apparent on its face:  "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230.  As the Ninth Circuit has explained, this provision "immunizes providers of interactive computer services against liability arising from content created by third parties."  *Roommates*, 521 F.3d at 1162; *accord Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("§ 230 creates a federal immunity to any cause of action

that would make service providers liable for information originating with a third-party user of the service."). That includes any claim that seeks to assign liability to service providers based on whether or how they exercise "traditional editorial functions," *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003), such as any "efforts, or lack thereof, to edit, monitor, or remove user generated content," *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852 (9th Cir. 2016).

Section 230 immunity serves two purposes: (1) "to encourage the unfettered and unregulated development of free speech on the Internet"; and (2) to eliminate disincentives for service providers to self-police their platforms, out of fear that such action might itself subject them to liability. *Batzel*, 333 F.3d at 1027-1028. Given these important interests and the broad statutory language, courts across the country "have treated § 230(c) immunity as quite robust." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003). Section 230 has been applied to a broad swath of content, including material alleged to be discriminatory, *Roommates*, 521 F.3d at 1173-1174; false and defamatory speech, *Zeran*, 129 F.3d at 327; vile and lawless advertisements posted by sex traffickers, *Doe v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016); an abhorrent and explicit incitement to violence by a terrorist group, *Klayman*, 753 F.3d at 1356-1357; and acts allegedly constituting the negligent infliction of emotional distress, *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056 (N.D. Cal. 2016).

Judge Orrick's two decisions in *Fields v. Twitter* and the recent *Cohen* decision show why § 230 bars the claims here. The plaintiffs in *Fields* alleged that Twitter had provided "material support" to ISIS by permitting ISIS members and sympathizers to use its services and that that "support" had proximately caused plaintiffs' injuries. The plaintiffs in *Cohen* alleged the same with respect to Facebook and Hamas. The courts held that § 230 barred the claims because they sought to hold Twitter and Facebook liable for a quintessential publisher function—making third-party content available on their platforms. *See Fields I*, 200 F. Supp. 3d at 970-974; *Fields II*, 2016 WL 6822065, at *5-7, *10-11; *Cohen*, 2017 WL 2192621, at *12-13. That conclusion is correct and the reasoning behind it applies with equal force here.

## B. Plaintiffs' Claims Meet All The Requirements Of § 230 Immunity

Section 230 mandates dismissal when (1) the defendant is a "provider … of an interactive

computer service"; (2) the allegedly harmful content at issue was "provided by another information content provider," and not the defendant; and (3) the claim seeks to hold the defendant liable as a "publisher or speaker" of that content.  47 U.S.C. § 230(c)(1); *see also Barnes*, 570 F.3d at 1100-1101.  Each of these elements is met here.

### 1.    Defendants Provide "Interactive Computer Services"

An "interactive computer service" includes "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2).  It is undisputed that Defendants' online platforms satisfy this definition because users access their servers to share information with others.  FAC ¶ 1 (describing Defendants' platforms as "social networks"); *accord Fields I*, 200 F. Supp. 3d at 969 (no dispute that Twitter is an interactive computer service); *Lancaster v. Alphabet Inc.*, No. 15-CV-05299-HSG, 2016 WL 3648608, at *3 (N.D. Cal. July 8, 2016) (finding that YouTube and Google are interactive computer services); *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015) (same for Facebook).

### 2.    Third Parties Provided The Allegedly Harmful Content Underlying Plaintiffs' Claims

The second element—that "another information content provider" provided the content at issue—also is met here.  An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).  "[S]o long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process." *Carafano*, 339 F.3d at 1124.  Plaintiffs concede that third parties, not Defendants, created *all* of the Hamas-related content that was allegedly posted on Defendants' services.  FAC ¶ 151.

This conclusion is unaffected by Plaintiffs' allegation that Defendants derived revenue from displaying advertisements.  FAC ¶¶ 90-92, 99-102.  Plaintiffs' concession that Defendants did not create the content of any such ads (*id.* ¶ 151) forecloses any argument based on them. The "fact that a website elicits online content for profit is immaterial." *Goddard v. Google, Inc.*,

1    No. C 08-2738, 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008) (rejecting argument that

2    § 230 did not apply because Google earned ad revenue in conjunction with display of user-

3    generated content); *accord Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685, 690 n.9 (S.D.

4    Miss. 2014) (same for Amazon).  There is no "for-profit exception to § 230's broad grant of

5    immunity."  *M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041,

6    1050 (E.D. Mo. 2011); *accord Roommates*, 521 F.3d at 1161, 1174-1175 (affirming immunity

7    even though website derived "revenue from advertisers and subscribers").

8         Stripping providers of immunity merely because they make money through advertising

9    also would make no sense.  It would improperly "elid[e] the crucial distinction between, on the

10   one hand, taking actions (traditional to publishers) that are necessary to the display of

11   unwelcome and actionable content and, on the other hand, assuming responsibility for what

12   makes the displayed content illegal or actionable."  *Jones v. Dirty World Entm't Recordings*

13   *LLC*, 755 F.3d 398, 414 (6th Cir. 2014).  And it would render § 230 a dead letter, as most service

14   providers are able to operate only by generating revenue through advertising displayed alongside

15   third-party user-created content.

16        Equally without merit is Plaintiffs' contention that, by allegedly displaying ads on the

17   same page as alleged terrorist content, Defendants created new, composite content as to which

18   Defendants themselves were "information content providers."  FAC ¶¶ 91-92, 96-100, 148-155.

19   Courts, including the Ninth Circuit, have uniformly rejected this gambit, holding that § 230

20   immunity is not forfeited merely because the third-party content at issue was displayed alongside

21   other third-party content (or even other content created by the service provider itself).  The

22   provider's conduct falls outside § 230 only where it "materially contribut[ed]" to *the alleged*

23   *unlawfulness* of the content.  *Roommates*, 521 F.3d at 1167-1168; *accord Jones*, 755 F.3d at 410

24   ("material contribution" means "being responsible for what makes the displayed content

25   allegedly unlawful").  Here, Plaintiffs do not (and cannot) allege that Defendants, by allegedly

26   displaying ads near the challenged postings, either materially contributed to the illegality of, or

27   "change[d] the meaning and purpose" of, any Hamas-related content.  *Ascentive*, *LLC v. Opinion*

28   *Corp.*, 842 F. Supp. 2d 450, 474 (E.D.N.Y. 2011).

Nor does it matter that Defendants allegedly "target[ed] advertisements based on viewers and content" through the use of "proprietary algorithms." FAC ¶¶ 91-92, 149. The technical processes by which those ads were placed do not change the application of § 230. The Ninth Circuit and other courts have held that the use of tools that filter or arrange third-party content does not involve the "creation" or "development" of information under § 230. *Roommates*, 521 F.3d at 1167-1168; *Carafano*, 339 F.3d at 1124 (classifying user information into categories); *Levitt v. Yelp! Inc.*, 2011 WL 5079526, at *6-9 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014) (aggregating ratings based on user-generated data); *see also Roommates*, 521 F.3d at 1169 (neutral tools do not affect § 230 immunity even if used to "carry out what may be unlawful or illicit" activities).

### 3.   Plaintiffs' Claims Seek To Treat Defendants As Publishers

Finally, Plaintiffs' claims seek to hold Defendants liable as the "publisher or speaker" of allegedly harmful third-party content within the meaning of § 230. Plaintiffs seek to hold Defendants liable for the emotional distress they allegedly suffered as a result of the Dallas shooting because, they allege, Defendants "knowingly and recklessly" permitted Hamas or its allies to use their platforms to spread propaganda, raise funds, and recruit followers, and failed to take "meaningful action to stop" this activity by "censor[ing] user content" or "shut[ting] down … [Hamas]-linked account[s]" (FAC ¶¶ 1, 43, 53, 69, 72)—omissions that, Plaintiffs allege, constituted "material support" for Hamas, which in turn triggered a circuitous, multi-step chain reaction that ultimately led Micah Johnson to fire a gun at police officers in Dallas. The only alleged acts by Defendants in this attenuated chain—allegedly allowing content to be published or failing to censor it—are "traditional editorial functions," and therefore are "precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230." *Roommates*, 521 F.3d at 1171-1172, 1184 (provider not liable for "failing to detect and remove" unlawful content); *see also Klayman*, 753 F.3d at 1355, 1358, 1359 (rejecting claims against Facebook for allegedly "refus[ing]" to take down "Intifada" pages that "called for Muslims to rise up and kill the Jewish people"). "[R]emoving content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a

publisher of the content it failed to remove." *Barnes*, 570 F.3d at 1103.

Because this same theory underlies all Plaintiffs' claims, § 230 mandates dismissal of the entire FAC.  A plaintiff cannot avoid § 230 simply by placing a different "labe[l]" on "an action that is quintessentially that of a publisher." *Barnes*, 570 F.3d at 1103.  For that reason, courts have dismissed exactly the sort of claims alleged here, including claims for providing material support to terrorists, *Fields I*, 200 F. Supp. 3d 964, *Fields II*, 2016 WL 6822065, *Cohen*, 2017 WL 2192621, negligent infliction of emotional distress, *Caraccioli*, 167 F. Supp. 3d 1056, aiding and abetting, *Goddard*, 2008 WL 5245490, at *7, *M.A. ex rel. P.K.*, 809 F. Supp. at 1041, and conspiracy, *Shrader v. Beann*, 503 F. App'x 650, 653 n.1, 654 (10th Cir. 2012).

Nor can Plaintiffs avoid this result by reformulating their claims as resting on Defendants' "provision of the infrastructure which provides material support to HAMAS," rather than on the "content of HAMAS' social media postings."  FAC ¶ 7.  The courts in *Fields* and *Cohen* rejected a nearly identical argument—that plaintiffs' claims turned on the "provision of accounts" and not on the provider having published ISIS- or Hamas-related content.  *See Fields I*, 200 F. Supp. 3d at 970-974; *Fields II*, 2016 WL 6822065, at *5-7; *Cohen*, 2017 WL 2192621, at *12-13.  And federal appellate courts have rejected attempts outside the context of terrorism to evade § 230 by casting claims as concerning only the provision of accounts.  *See Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 416, 420, 422 (1st Cir. 2007) (platform's decision "not [to] prevent a single individual from registering under multiple screen names"—an act that allegedly "ma[de] it possible for individuals to spread misinformation more credibly"—was "as much an editorial decision with respect to that misinformation as a decision not to delete a particular posting"); *Doe v. MySpace, Inc.*, 528 F.3d 413, 419-420 (5th Cir. 2008) (allegations premised on failure to screen users when opening an account was "merely another way of claiming that MySpace was liable for publishing [users'] communications").

The principal problem, as Judge Orrick noted, is that a theory of liability for providing infrastructure would be just another way of penalizing a protected publishing decision:  "the decision to permit third parties to post content." *Fields I*, 200 F. Supp. 3d at 972.  A decision about who may use an online communications platform is just as much a decision about what

content may be posted as a decision to withdraw or alter specific content directly.  *See Fields I*, 200 F. Supp. 3d at 972-973; *Cohen*, 2017 WL 2192621, at *12 ("Facebook's choices as to who may use its platform are inherently bound up in its decisions as to what may be said on its platform."); *cf. Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) (restrictions based on speaker's identity often are '"simply a means to control content'").  *Fields II* reinforced this point:  "[P]rohibit[ing] ISIS members and affiliates from acquiring accounts … [is] a policy that necessarily targets the content, ideas, and affiliations of particular account holders."  2016 WL 6822065, at *6.  The only difference between an infrastructure-provision theory and a failure-to-remove theory is that the former would hold Defendants "liable for granting permission to post … instead of for allowing postings that have already occurred."  *Fields I*, 200 F. Supp. 3d at 972.  Both target publisher activity, and both are barred by § 230.  *Id.*

Not only is the infrastructure theory insufficient to avoid immunity, but it also is not even an accurate description of Plaintiffs' claims.  Despite Plaintiffs' disclaimers, their FAC plainly seeks to hold Defendants liable for third-party *content* made available through their services.  Like the *Fields* pleadings from which it borrows, the FAC is "riddled with detailed descriptions" of Hamas-related "messages, images, and videos"—exactly what was alleged in *Fields* with respect to ISIS.  *Fields I*, 200 F. Supp. 3d at 971; *see also Fields II*, 2016 WL 6822065, at *7.  Its premise—and sole basis for attempting to connect Defendants to the underlying events—is that Hamas and its supporters allegedly used Defendants' sites to spread hateful messages and Defendants should have done more to remove such material.  *Fields II*, 2016 WL 6822065, at *7; *Cohen*, 2017 WL 2192621, at *13.  That is a content-based theory.  Indeed, Plaintiffs allege *no other basis* than the content of specific postings for asserting that Defendants' platforms supported Hamas and thereby somehow caused the Dallas shooting.  If Hamas had simply been granted access to Defendants' "infrastructure" (i.e., services) but had never used that infrastructure to disseminate content, Plaintiffs could not possibly claim that Defendants "ha[ve] been instrumental to the rise of HAMAS"—let alone that Defendants "enabled [Hamas] to … incite others to carry out terrorist attacks, including" the Dallas shooting.  FAC ¶ 1.  Such a

theory necessarily seeks to hold Defendants liable for the alleged consequences of content transmitted through their services.

This conclusion is unaffected by Plaintiffs' assertions that Defendants could have used various (supposedly content-neutral) strategies to block more terrorist-related accounts. FAC ¶¶ 70-87. Because the necessary objective of such strategies would have been to exclude objectionable *content*, holding Defendants liable for not employing them would run afoul of § 230. Moreover, Plaintiffs' suggestion that these strategies would not have required Defendants to monitor or review third-party content (*id.* ¶¶ 82-85) is simply wrong. For example, Plaintiffs fault Defendants' alleged failure to develop and employ an automated mechanism to block new accounts with the same "name root" (and incremental "numerical suffix[es]") as accounts that Defendants previously removed due to a suspected ISIS connection. *Id.* ¶¶ 82-83. But the only way to discover that a particular "name root" is associated with suspect content would be *based on suspect content* posted by a prior account. *E.g., id.* ¶ 81 ("The day after the attacks, he is now DriftOne0151 *and he posts pictures of those individuals who conducted the [ISIS] attacks*." (emphasis added)). The same is true of Plaintiffs' proposed strategy of blocking new accounts that immediately seek and receive large numbers of followers. *Id.* ¶¶ 84-86. This strategy, too, relies on third-party content to decide whether an account is suspicious—namely, a Tweet containing a request such as, "Please F0ll0w & Retweet This Post!" (*id.* ¶ 77 fig. 11, ¶ 78 fig. 12, ¶ 79 fig. 13), and/or the responses of other users, (*id.* ¶ 85).

In sum, as in *Fields* and *Cohen*, Plaintiffs' effort to impose liability based on Defendants' handling of third-party content is barred by § 230.

## II.    All Of Plaintiffs' Claims Also Fail On Their Own Terms

Even apart from § 230, each of Plaintiffs' claims fail as a matter of law because the FAC's allegations do not establish the essential elements of their claims.

### A.    The Complaint Fails To Allege Facts Plausibly Establishing Proximate Cause (Counts III-V)

As an initial matter, Plaintiffs' claims for direct liability under the ATA and state law (Counts III-V) fail because Plaintiffs cannot causally link their injuries to Defendants' alleged

1 wrongful conduct.  A plaintiff asserting a claim for direct liability under the ATA must plead and

2 prove injury "by reason of"—that is, proximately caused by—"an act of international terrorism"

3 committed by the defendant.  18 U.S.C. § 2333(a); *see Al Rajhi*, 714 F.3d at 123-125 ("by reason

4 of" language imposes proximate cause requirement); *Rothstein*, 708 F.3d at 95.  Congress

5 borrowed this proximate cause language from the civil remedy provisions of the Sherman Act,

6 26 Stat. 209 (1890), the Clayton Act, 15 U.S.C. § 15(a), and RICO, 18 U.S.C. § 1964(c).  *See*

7 *Rothstein*, 708 F.3d at 95.  Because Congress "used the same words," we "assume it intended

8 them to have the same meaning"—namely, that plaintiffs must show "some direct relation

9 between the injury asserted and the injurious conduct alleged."  *Holmes v. Sec. Inv'r Prot. Corp.*,

10 503 U.S. 258, 268 (1992); *see also Bank of Am. Corp. v. City of Miami, Fl.*, Nos. 15-1111, 15-

11 1112, 2017 WL 1540509, at *9 (U.S. May 1, 2017) ("[D]irectness principles [apply] to statutes

12 with 'common-law foundations'").[3]  Proximate causation likewise is an essential element of a

13 claim for negligent infliction of emotional distress.  *See, e.g.*, *Campos v. Ysleta Gen. Hosp.*, 836

14 S.W.2d 791, 795 (Tex. App. 1992); *Erlich v. Menezes*, 21 Cal. 4th 543, 555 (1999).

15      Plaintiffs' attenuated chain of causation does not come close to establishing a "direct

16 relation" between their alleged injuries and Defendants' allegedly unlawful conduct.  Beyond

17 insufficient conclusory assertions (FAC ¶¶ 165, 182), *see Iqbal*, 556 U.S. at 681; *Rothstein*, 708

18 F.3d at 95, 97; *Al Rajhi*, 714 F.3d at 124-125, the FAC piles speculation upon speculation:

19

20 [3] Some out-of-circuit courts have read § 2333(a) to allow a looser causal connection than the
*Holmes* test.  *E.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 697 (7th Cir.
21 2008) (en banc) (applying a more "relaxed" causation standard, at least in cases involving
monetary donations funneled knowingly to a terrorist group); *Linde v. Arab Bank, PLC*, 97 F.
22 Supp. 3d 287, 328 (E.D.N.Y. 2015) (requiring plaintiff to establish that defendant's acts were "a
substantial factor in causing plaintiffs' injuries" and that "such injuries were a foreseeable result
23 of those acts"), *appeal pending*, 2d Cir. No. 16-2134.  These approaches ignore the express
requirement that the injury be "by reason of" the defendant's actions—language that, as shown
24 above, had an established meaning when § 2333(a) was enacted.  *See Holmes*, 503 U.S. at 267.
Under a statutory "by reason of" test, there must be a "direct … connection" between the
25 defendant's conduct and Plaintiffs' injury.  *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1,
11-12 (2010); *Couch v. Cate*, 379 F. App'x 560, 565 (9th Cir. 2010).  In any event, as the *Fields*
26 court held in rejecting the ATA claims in that case, the causal "connection" alleged here is
"tenuous at best" and so insufficient "[e]ven under … [a] 'substantial factor' test."  *Fields I*, 200
27 F. Supp. 3d at 974; *see also Fields II*, 2016 WL 6822065, at *9.

28

(1) Plaintiffs allegedly suffered emotional distress because of their connections to persons killed or injured by Johnson's crime (FAC ¶¶ 137-138); (2) Johnson allegedly was inspired to commit his crime after becoming "radicalized, in part" by viewing the Facebook pages of certain "black separatist hate groups" (*id.* ¶¶ 129-132, 136); (3) some "black separatist hate groups" have posted content online calling for the killing of police officers in retaliation for unjustified shootings by police officers (*id.* ¶¶ 114-118, 121); (4) Hamas and others supposedly "tied" to Hamas allegedly "inspired," and expressed "solidarity" with, "black separatist hate groups" on- and off-line (*id.* ¶¶ 103-109, 110-113, 120); (5) Hamas and/or its sympathizers allegedly used Defendants' services to transmit content to strengthen its organization (*id.* ¶¶ 1-2, 25-42), and (6) this claimed use was made possible by Defendants' alleged failure to block Hamas and/or its sympathizers from using their platforms (*id.* ¶¶ 1, 43, 53, 69, 72).[4]

The insufficiency of this extremely attenuated chain of causation is compounded by the weakness of each link. Inspiration alone—rather than money, weapons, or other tangible aid—purportedly connects each critical step: Plaintiffs posit that Hamas and its sympathizers (or simply "pro-Palestinian" groups) "inspired," or expressed "solidarity" with, certain of the so-called "black separatist groups," some of whose messages allegedly "radicalized" Johnson. FAC ¶¶ 103, 132, 142. Plaintiffs fail even to link each step to the next: The FAC nowhere alleges that the specific Facebook pages Johnson supposedly viewed or "liked" called for murdering police officers or that the "black separatist" groups who created those pages are even the same groups or individuals who allegedly may have been inspired by Hamas. *See id.* ¶¶ 106-107, 114-118, 121 (referring to posts by users with no alleged affiliation to any group whose page Johnson viewed). Instead, the FAC lumps together an array of different groups and individuals, including Black Lives Matter, seemingly on the theory that they all shared the same undefined "black separatist hate group" ideology and support of violence.

---

[4] A trio of unsupported allegations also state that Johnson was "radicalized, in part, by reviewing postings of HAMAS and other terrorist groups on the internet and Defendants' social media sites." FAC ¶ 129; *see also id.* ¶¶ 132, 142. Such conclusory allegations must be disregarded on a motion to dismiss. *See In re Gilead Scis. Sec. Litig.,* 536 F.3d at 1055. And even if considered, the allegations do not cure the myriad other flaws in Plaintiffs' causation theory.

Courts repeatedly have rejected far less attenuated theories of causation.  The Second Circuit dismissed allegations that "providing routine banking services to organizations and individuals said to be affiliated with al Qaeda … proximately caused the September 11, 2001 attacks or plaintiffs' injuries." *Al Rajhi*, 714 F.3d at 124.  That court likewise found insufficient allegations that UBS provided a state sponsor of terrorism with cash that would be used to cause and facilitate terrorist acts, *Rothstein*, 708 F.3d at 97, and allegations that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations," *Al Rajhi*, 714 F.3d at 124.  In *Fields*, Judge Orrick rejected as too "expansive" the theory that Twitter's alleged "provision of accounts to ISIS" rendered Twitter responsible for a terrorist attack allegedly carried out by an ISIS member.  *Fields II*, 2016 WL 6822065, at *9.  Each of those alleged causation theories was deemed "too speculative [and] attenuated to raise a plausible inference of proximate causation." *Fields I*, 200 F. Supp. 3d at 974 n.4; *Fields II*, 2016 WL 6822065, at *10 n.3.  The same is true here, where the chain of inferences is even more attenuated and less plausible.

Accepting Plaintiffs' unbounded causation theory would have staggering consequences, potentially exposing every online platform to liability for violence anywhere in the world simply because the perpetrator allegedly was inspired by hateful messages from a person or group who in turn was inspired by a terrorist organization (or groups with objectives similar to that terrorist organization) that included members or sympathizers who may have been among the platforms' billions of users.  *See Fields II*, 2016 WL 6822065, at *9 ("Under such an expansive proximate cause theory, any plaintiff could hold [Defendants] liable for any ISIS-related injury without alleging any connection between a particular terrorist act and [Defendants'] provision of accounts.").  Such a theory would raise serious First Amendment concerns, essentially exposing Internet providers to liability merely for providing a neutral forum on which some actors engage in offensive or hateful speech.[5]  Indeed, Plaintiffs' expansive theory would require platforms to

---

[5] The First Amendment protects an intermediary's editorial judgments regarding what third-party speech to transmit.  *E.g., Turner Broad. Sys. v. FCC,* 512 U.S. 622, 636 (1994)); *Arkansas Educ. Telev. Comm'n v. Forbes*, 523 U.S. 666, 674 (1998).  In addition, recognizing the tension

detect and remove not only incitements to violence, but also the plainly protected speech of

"[b]lack journalists, artists and organizers representing Ferguson, [and] Black Lives Matter,"

FAC ¶ 110, to name just a few.  No principle of law or logic supports that result.

### B.     Plaintiffs' Secondary Liability Claims Fail (Counts I-II)

Plaintiffs' claims for secondary liability under 18 U.S.C. § 2333(d) also fail.  Section

2333(d), added to the ATA last year by the Justice Against Sponsors of Terrorism Act, Pub. L.

No. 114-222 (enacted Sept. 28, 2016) ("JASTA"), provides a limited cause of action for aiding

and abetting and conspiracy:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189) …, as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

*Id.*  Section 2333(d) requires, at a minimum, (1) that plaintiffs' injuries have "aris[en]" from "an

act of international terrorism" that was (2) "committed, planned, or authorized" by a designated

"foreign terrorist organization," and (3) that defendants have aided and abetted (by "knowingly

providing substantial assistance" to) or conspired with (by agreeing to and acting in furtherance

of a common illegal enterprise) "the person who committed" the alleged "act of international

terrorism."  *Id*.  The FAC here does not satisfy any of these elements.

### 1.     The Dallas Shooting Was Not An Act Of "*International* Terrorism"

Under § 2333(d), aiding and abetting and conspiracy are actionable *only* where the

primary violation (the act from which plaintiffs' injuries allegedly arose) was an "act of

---

between the First Amendment and a broad reading of the material support statutes on which
Plaintiffs' principal claims rest, the Supreme Court and Ninth Circuit have applied the avoidance
canon to narrow the reach of those statutes.  Liability for alleged "material support" by means of
speech-related activity may therefore be imposed only where the speech bears a direct, non-
speculative relationship to terrorist purposes and the defendant actually coordinated or acted in
concert with the terrorist group, *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 23-25, 31-
32 (2010); *Al Haramain Islamic Found. v. Dep't of Treasury*, 686 F.3d 965, 995-1001 (9th Cir.
2012)—requirements that Plaintiffs cannot satisfy.

*international* terrorism."  18 U.S.C. § 2333(d) (emphasis added).  "[I]nternational terrorism," *id.* § 2331(1), as distinguished from the separate defined term "domestic terrorism," *id.* § 2331(5), means terrorism that occurs "primarily outside … the United States," or "transcend[s] national boundaries" in the "means by which [it is] accomplished, the persons [it] appear[s] intended to intimidate or coerce, or the locale in which [its] perpetrators operate or seek asylum."  *Id.* § 2331(1)(C).  The statute does not authorize any form of civil liability (including secondary liability) for instances of domestic terrorism.

Here, the Dallas attack plainly was not an act of "international terrorism."  The shooting occurred entirely within the United States, as Plaintiffs admit, in Dallas, Texas; the "perpetrator[]," Johnson, was a former U.S. soldier (FAC ¶ 130 n.36); and the victims (the people Johnson "intended to intimidate or coerce," 18 U.S.C. § 2331(1)(C)) all were Dallas law enforcement officers or bystanders (*id.* ¶¶ 1, 8).  Plaintiffs do not allege that Johnson's actions were directed or funded by any international terrorist group, that he traveled overseas to train for or plan the attack, or that there was any other relevant international connection.  Rather, the FAC alleges that Johnson was radicalized by viewing content online that had been created by "black separatist hate groups" and that he was angry that other U.S. police officers had killed black individuals in the United States.  *Id.* ¶¶ 129-132 & 130 n.36.  In short, nothing material about the Dallas shooting occurred outside the United States or transcended national boundaries.

No court has suggested that an attack committed by an American in the United States constitutes "international terrorism" under § 2331(1).  *See Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 221-222 (S.D.N.Y. 2003) (warning that "an expansive interpretation of 'international terrorism' might render 'domestic terrorism' superfluous").  Indeed, to accept Plaintiffs' suggestion—that an attack in the United States that was allegedly inspired by domestic "hate groups" who themselves were allegedly inspired by a foreign terrorist organization constitutes "international terrorism" (FAC ¶¶ 126-132, 139-147)—would radically expand the definition of "international" terrorism and disrupt a deliberate legislative choice.  Congress created a federal civil remedy exclusively for injuries arising from acts of *international* terrorism because it was filling a perceived gap in the law:  before the ATA, U.S. victims of

terrorist acts that occurred abroad or in ways that transcended national boundaries may have lacked adequate remedies under existing *domestic* laws.  *See, e.g.*, H.R. Rep. No. 102-1040 (1992) (§ 2333 would "facilitate civil actions" against terrorist attacks "occurring" in "locale[s]" that "might not have been subject to civil action in the U.S.").  But existing domestic law— including state tort law—already provided and continues to provide remedies for victims of violence and terrorism within the United States.  Here, Plaintiffs have invoked those domestic laws, and although their state law claim fails for reasons unrelated to geography, their assertion of that claim further confirms that their theory of liability does not satisfy the "international terrorism" element of § 2333(d).

### 2. Plaintiffs Fail To Allege Facts Establishing That Hamas Committed, Planned, Or Authorized The Dallas Shooting

Section 2333(d) allows secondary liability *only* where the relevant act of international terrorism was "committed, planned, or authorized" by an entity that the U.S. government has formally designated as a foreign terrorist organization.  That is not the case here.

Although Hamas is a designated foreign terrorist organization, the FAC fails to allege facts establishing that Hamas "committed, planned, or authorized" the Dallas shooting.  Instead, it asserts—in a series of wholly conclusory allegations—that Johnson was radicalized by "reviewing postings of HAMAS and other terrorist groups," that Hamas's "stated goal" was to foment attacks by radicalizing individuals through social media, and that accordingly "an attack in the United States to which HAMAS's use of social media caused or contributed constitutes an action by HAMAS."  FAC ¶¶ 129, 132, 139, 141-142.  But Congress did not create a cause of action for attacks carried out by a lone wolf with no connection to a designated terrorist organization other than being "radicalize[d]" by "reviewing [its online] postings."  FAC ¶¶ 129, 139.  Rather, Congress carefully limited § 2333(d) to attacks "committed, planned, or authorized" by a designated foreign terrorist organization—terms that all require *direct*, *deliberate*, and *advance* involvement by the terrorist organization with the attack.  Thus, even if credited, the FAC's unsubstantiated factual allegations about Hamas are insufficient.

The FAC's allegations about "black separatist hate groups" are even further removed

from what the statute requires.  Plaintiffs offer vague claims that a "movement" allegedly "tied to Hamas" had "impl[ied] a connection between Hamas goals and black revolutionaries" and that some "Black journalists, artists and organizers representing Ferguson, Black Lives Matter, [and] Black Youth Project 100" had taken a delegation to "the occupied Palestinian Territories and Israel."  *Id.* ¶¶ 108-113.  None of this provides any basis, much less a plausible one, for even suggesting that Hamas "committed," "planned," or "authorized" what happened in Dallas.  And, as the FAC implicitly acknowledges by focusing on Hamas, neither Black Lives Matter nor any of the other alleged "black separatist hate groups" is a designated terrorist organization within the meaning of § 2333(d), even if the FAC could allege (which it does not, and cannot) that any of these organizations "committed, planned, or authorized" the Dallas shootings.  Conspicuously missing from the FAC is any suggestion that Hamas knew of Johnson, communicated with or instructed him regarding the attack, knew about or approved his plan, or provided any direct assistance to him in connection with the attack.  As such, the FAC falls far short of alleging that the Dallas shooting was "committed, planned, or authorized" by Hamas.

### 3.   The FAC Fails To Allege Facts Establishing That Defendants Aided And Abetted Or Conspired With Johnson

Finally, Plaintiffs have not pled and cannot plead the essential substantive elements of aiding and abetting or conspiracy.  By its terms, § 2333(d) requires that the defendant have "knowingly" provided "substantial assistance" to or conspired with "the person who committed [the] act of international terrorism" that injured the plaintiff.  Here, the person who committed the acts that allegedly injured Plaintiffs was Micah Johnson (although, as shown above, those acts did not meet the definition of "international" terrorism), and the FAC does not come close to alleging the critical elements of secondary liability relating to Johnson's acts.

As for aiding and abetting, Plaintiffs offer not a single factual allegation to suggest that Defendants "knowingly" provided any aid to Johnson (or, indeed, to anyone else supposedly connected to the Dallas attack).  *See generally Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983) (defendant must "knowingly and substantially assist the principal violation"), *cited by* JASTA § 2(a)(5), Pub. L. No. 114-222.  Plaintiffs' only references to Defendants' supposed

1    knowledge of Johnson's crime are threadbare recitals not entitled to a presumption of truth.  *See*

2    *Iqbal*, 556 U.S. at 678.  And even those are insufficient.  For example, the FAC asserts without

3    support that "Defendants knowingly provided substantial assistance and encouragement to

4    HAMAS … in committing, planning, or authorizing" the Dallas shooting.  FAC ¶ 162.  Not only

5    does this establish no connection between Defendants and Johnson, but it also offers nothing to

6    support the conclusion that Defendants had advance knowledge of the Dallas shooting, much less

7    that they intended to assist or encourage that act.

8          Nor does the FAC plead facts establishing that Defendants "substantially assisted"

9    anyone (much less Johnson) in connection with the Dallas shooting.  In *Halberstam*, the court

10   looked to the five Restatement factors to assess whether assistance to another's unlawful act was

11   "substantial" enough for aiding and abetting liability:  "the nature of the act encouraged, the

12   amount of assistance given by the defendant, his presence or absence at the time of the tort, his

13   relation to the other [tortfeasor] and his state of mind."  705 F.2d at 478 (quoting Restatement

14   (Second) of Torts § 876, cmt. d).  The court also looked to a sixth factor, the "duration of the

15   assistance provided."  *Id.* at 484.  These factors assume that the defendant must have acted in

16   some deliberate way to assist the perpetrator in carrying out the "principal violation."  But the

17   FAC asserts nothing remotely like that.  It does not allege Defendants played any role in

18   assisting Johnson's plan for the attack, much less a "substantial" or "essential" one, or one that

19   lasted for a meaningful duration or involved any culpable state of mind.  Plaintiffs allege only

20   that Defendants provided social media services to the public, and that Hamas sympathizers or

21   affiliates might have been among the billions who used those services.  And Plaintiffs admit that,

22   far from promoting Hamas content, each Defendant had a practice of removing Hamas content

23   and accounts from its platform.  *E.g.*, FAC ¶¶ 55, 69, 72, 75-76, 79.  None of this supports a

24   conclusion that Defendants provided "substantial assistance" to the acts that allegedly injured the

25   Plaintiffs here.  *See Halberstam*, 705 F.2d at 478, 488.

26         Plaintiffs also fail to allege facts supporting a conspiracy claim under § 2333(d).  Civil

27   conspiracy requires:  "an agreement to do an unlawful act or a lawful act in an unlawful

28   manner," "an overt act in furtherance of the agreement," and "injury caused by the act."

1   *Halberstam*, 705 F.2d at 487; *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th

2   Cir. 1999) ("To prove a civil conspiracy, the plaintiff must show that the conspiring parties

3   'reached a unity of purpose or a common design and understanding, or a meeting of the minds in

4   an unlawful agreement.'").  Plaintiffs do not and cannot allege that any Defendant formed an

5   unlawful agreement with *anyone* concerning the Dallas shooting, much less with Johnson, as

6   would be required for liability under § 2333(d).  At most, Plaintiffs assert that Defendants

7   broadly agreed to provide their users with social media services, and that some of those users

8   were Hamas members or sympathizers.  That is not remotely a basis for a civil conspiracy claim.

9   ## C.   Plaintiff Pennie Has Not Pled A Cognizable Injury (All Counts)

10          All of Plaintiff Pennie's claims suffer from a further and fatal defect:  his failure (and

11   inability) to allege an injury cognizable under the ATA or the state law that governs his claim for

12   negligent infliction of emotional distress.  The ATA permits an action by "[a]ny national of the

13   United States injured in his person, property, or business," 18 U.S.C. § 2333(a), and incorporates

14   "general common law tort principles," *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1010 (7th

15   Cir. 2002); *accord Lelchook v. Commerzbank AG*, 2011 WL 4087448, at *2 (S.D.N.Y. Aug. 2,

16   2011); *Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 238 (D.R.I. 2004).  Under

17   traditional tort law, to recover for intentional or reckless infliction of emotional distress—the tort

18   most analogous to Mr. Pennie's ATA claims—where conduct was directed not at the plaintiff but

19   at another person, the plaintiff must be "a member of such person's immediate family who is

20   present at the time."  Restatement (Second) of Torts § 46(2)(a).  Similarly, for someone who, like

21   Mr. Pennie, was not a "direct victim" of a tort to recover for negligent infliction of emotional

22   distress under Texas law, the plaintiff must be "closely related" to the victim and his injury must

23   result from the plaintiff's "contemporaneous observance" of the incident.  *Freeman v. City of

24   Pasadena*, 744 S.W.2d 923, 923-924 (Tex. 1988) (no "bystander recovery for mental anguish"

25   by a stepfather who witnessed aftermath of car accident in which stepsons were injured).  "Th[is]

26   limitation may be justified by the practical necessity of drawing the line somewhere, since the

27   number of persons who may suffer emotional distress" from an unsettling event "is virtually

28   unlimited."  Restatement (Second) of Torts § 46, cmt. 1.

1   Mr. Pennie satisfies none of these bedrock requirements.  He alleges that he suffered

2   emotional distress—but no bodily harm—after observing the aftermath of the Dallas shooting, in

3   which officers he allegedly knew "individually and personally" were killed or injured.  FAC

4   ¶ 137.  But he does not allege he was present during the shooting or that anyone killed or hurt in

5   the shooting was a member of his family.  He thus meets neither the family nor the presence

6   requirements—both of which are essential to his claim.[6]

7   **III.    The FAC Should Be Dismissed With Prejudice**

8          This action should be dismissed with prejudice, as any further attempt to amend would be

9   futile.  *See AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

10  Plaintiffs have already amended once—after having had the benefit of Defendants' initial

11  motion—yet added little of substance and failed to cure any of the defects in the original

12  complaint.  *See Rivera v. BAC Home Loans Servicing*, 756 F. Supp. 2d 1193, 1200 (N.D. Cal.

13  2010); *In re Splash Tech. Holdings, Inc.*, 160 F. Supp. 2d 1059, 1071-1072 (N.D. Cal. 2001).

14  And putting Defendants to the time and expense of having to move again to dismiss would

15  disregard the nature of § 230 as an "*immunity* statute" that is meant to protect online service

16  providers, like Defendants, "not merely from ultimate liability, but from having to fight costly

17  and protracted legal battles."  *Roommates*, 521 F.3d at 1175.

18                                  **CONCLUSION**

19         For the foregoing reasons, the FAC should be dismissed with prejudice.

20

21

22

23  ────────────────

    [6] Defendants reserve the right to argue later that Plaintiff Zamarripa's non-presence during the

24  Dallas shooting is yet another reason why all of his claims must be dismissed.  But because this

    motion does not advance that argument as to Mr. Zamarripa, this motion does not call for the

25  Court to decide whether (1) (as some out-of-circuit courts have held) the ATA relaxes the

    presence requirement to permit surviving *immediate family members* to bring claims arising from

26  a family member's death in a terrorist attack, *cf. Biton v. Palestinian Interim Self-Government

    Auth.*, 310 F. Supp. 2d 172, 181-182 (D.D.C. 2004); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410,

27  426 (E.D.N.Y. 2009), or (2) applicable state law recognizes an NIED claim under Mr.

    Zamarripa's circumstances.

28

1  Dated:  June 23, 2017                         Respectfully submitted,

2          /s/ Kristin A. Linsley                     /s/ Patrick J. Carome

3  KRISTIN A. LINSLEY (CA SBN 154148)       SETH P. WAXMAN (*pro hac vice*)
   klinsley@gibsondunn.com                   seth.waxman@wilmerhale.com
4  JEANA BISNAR MAUTE (CA SBN 290573)       PATRICK J. CAROME (*pro hac vice*)
   jbisnarmaute@gibsondunn.com               patrick.carome@wilmerhale.com
5  SHELI R. CHABON (CA SBN 306739)          ARI HOLTZBLATT (*pro hac vice*)
   schabon@gibsondunn.com                    ari.holtzblatt@wilmerhale.com
6  GIBSON, DUNN & CRUTCHER LLP              WILMER CUTLER PICKERING
7  555 Mission Street, Suite 3000              HALE AND DORR LLP
   San Francisco, CA 94105-0921             1875 Pennsylvania Avenue, NW
8  Telephone:  (415) 393-8200               Washington, D.C. 20006
   Facsimile:  (415) 393-8306               Telephone:  (202) 663-6000
9                                           Facsimile:  (202) 663-6363
   **Attorneys for Defendant**
10 **FACEBOOK, INC.**
                                            MARK D. FLANAGAN (CA SBN 130303)
11         /s/ Brian M. Willen              mark.flanagan@wilmerhale.com
   BRIAN M. WILLEN (*pro hac vice*)         WILMER CUTLER PICKERING
12 bwillen@wsgr.com                            HALE AND DORR LLP
   WILSON SONSINI                           950 Page Mill Road
13   GOODRICH & ROSATI, P.C.                Palo Alto, CA  94304
14 1301 Avenue of the Americas              Telephone:  (650) 858-6000
   New York, NY 10019                       Facsimile:  (650) 858-6100
15 Telephone:  (212) 999-5800
   Facsimile:  (212) 999-5899               **Attorneys for Defendant**
16                                          **TWITTER, INC.**
   DAVID H. KRAMER (CA SBN 168452)
17 dkramer@wsgr.com
   LAUREN GALLO WHITE (CA SBN 309075)
18 lwhite@wsgr.com
   WILSON SONSINI
19   GOODRICH & ROSATI, P.C.
   650 Page Mill Road
20 Palo Alto, CA  94304
   Telephone:  (650) 493-9300
21 Facsimile:  (650) 565-5100

22

23 **Attorneys for Defendant**
   **GOOGLE INC.**
24

25

26

27

28

1
2

ATTORNEY ATTESTATION

3
4
5

I, Patrick J. Carome, am the ECF User whose ID and password are being used to file this Notice of Motion, Motion, and Memorandum.  In compliance with N.D. Cal. Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of the document has been obtained from each of the other signatories.

6
7

By:  /s/ Patrick J. Carome
     Patrick J. Carome

8
9

CERTIFICATE OF SERVICE

10
11

I hereby certify that on June 23, 2017, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

12
13

By:  /s/ Patrick J. Carome
     Patrick J. Carome

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28