UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRICK PENNIE, et al., | Case No. 17-cv-00230-JCS |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO DISMISS** |
| TWITTER, INC., et al., | Re: Dkt. No. 43 |
| Defendants. | |

## I.      INTRODUCTION

This case arises from a July 7, 2016 mass shooting in which Micah Johnson ambushed and killed five police officers in Dallas, Texas.  Plaintiffs are Rick Zamarripa, the father of one of the deceased officers, and Demetrick Pennie, another Dallas police officer who was one of the first responders to the attack.

The loss and suffering caused by Johnson's horrific act of violence are not in doubt.  The only issue before this Court, however, is whether Plaintiffs state a claim for relief against the particular defendants named in this case.  Plaintiffs seek to hold Defendants Twitter, Inc., Google Inc., and Facebook, Inc. liable for providing material support to Hamas, a Palestinian entity designated as a foreign terrorist organization, primarily in the form of access to Defendants' online social media platforms.  Defendants move to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and the Court held a hearing on September 22, 2017.  Because Plaintiffs have not plausibly alleged a causal connection between the shooting and Defendants' alleged conduct, and because the Communications Decency Act immunizes most if not all of the conduct at issue, Defendants' motion is GRANTED.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

## II.    BACKGROUND

### A.    Procedural History and Allegations of the First Amended Complaint

Plaintiffs filed this action on January 17, 2017.  *See* Compl. (dkt. 2).  Defendants moved to dismiss for failure to state a claim, *see* dkt. 40, and on June 9, 2017, Plaintiffs filed their operative First Amended Complaint in lieu of opposing the motion.  *See* 1st Am. Compl. ("FAC," dkt. 41).  The Court denied the first motion to dismiss as moot in light of the amended complaint.  *See* Order (dkt. 42).  Defendants now once again move to dismiss.  *See* Mot. (dkt. 43).

The general premise of Plaintiffs' First Amended Complaint is that Defendants have provided material support to Hamas by allowing Hamas and its members and affiliates to use Defendants' social media platforms, despite Hamas's designation as a terrorist group under United States law.  *See* FAC ¶¶ 1, 21–23.[2]  According to Plaintiffs, "Hamas's use of Defendants' sites" was responsible "in part" for "radicaliz[ing]" Micah Johnson, who killed five police officers and wounded several other people when he "ambushed and fired upon a group of police officers in Dallas, Texas." *Id.* ¶¶ 1, 123.  Plaintiff Rick Zamarripa's son Patrick, a six-year veteran of the Dallas Police Department, was among the officers killed in the attack. *Id.* ¶ 124.  Plaintiff Demetrick Pennie, himself an officer of the Dallas Police Department, was among the first responders to the scene of the attack and personally knew the deceased officers. *Id.* ¶ 137.  Plaintiffs continue to suffer emotional distress as a result of the attack. *Id.* ¶¶ 137–38.

Hamas, founded during the First Intifada in 1987 as an offshoot of the Muslim Brotherhood, is a militant Palestinian organization that has "carried out thousands of terrorist attacks in Israel, the West Bank, and Gaza, murdering hundreds of Israeli and U.S. citizens . . . and wounding thousands more." *Id.* ¶¶ 15–20, 24.  The United States has designated Hamas as a "Foreign Terrorist Organization" pursuant to 8 U.S.C. § 1189 in 1997, and as a "Specially Designated Global Terrorist" pursuant to Executive Order 13224 in 2001. *Id.* ¶¶ 21–23.

Plaintiffs allege that "[w]ithout Defendants Twitter, Facebook, and Google (YouTube),

---

[2] Although Defendants disputed the accuracy of certain allegations in the First Amended Complaint at the hearing, factual allegations are generally taken as true on a motion to dismiss under Rule 12(b)(6).  Nothing in this order should be construed as resolving the factual accuracy of Plaintiffs' allegations.

HAMAS' ability to radicalize and influence individuals to conduct terrorist operations outside the Middle East would not have been possible." *Id.* ¶ 2. Hamas operates an official English-language Twitter account with more than 37,000 followers, and an Arabic-language account with 281,000 followers, among other accounts, and "has used Google (YouTube) and Facebook in a similar manner." *Id.* ¶¶ 3–6. As reported by various government officials, news outlets, and other commentators, Hamas and other terrorist groups use Defendants' products—including direct messaging features—to recruit members, solicit funds, and "spread propaganda and incite fear." *Id.* ¶¶ 25–59. All Defendants place advertisements on (and thus derive revenue from) Hamas postings, and because Google shares revenue with the creators of some videos posted to YouTube, Plaintiffs allege that Google has provided funds to Hamas. *Id.* ¶¶ 90–102. Plaintiffs assert liability on the grounds that Defendants provide "infrastructure" to Hamas, profit from Hamas's use of their service and "create unique content" by placing ads on Hamas's posts, and, in the case of Google, share advertising revenue with Hamas. *Id.* ¶ 7.

Although Plaintiffs' theory of how Defendants support Hamas is relatively clear, the connection between that support and the Dallas shooting is not. Plaintiffs assert in a conclusory fashion that, "[o]n information and belief, Micah Johnson was radicalized, in part, by reviewing postings of HAMAS and other terrorist groups on the internet and Defendants' social media sites." *Id.* ¶ 129; *see also, e.g.*, *id.* ¶ 132 ("Micah Johnson was radicalized by HAMAS's and other Black Separatist Hate Groups' use of Defendants' tools to conduct terrorist operations."). The First Amended Complaint does not, however, include allegations addressing particular content posted by Hamas that Johnson allegedly viewed.

The crux of Plaintiffs' complaint is instead that Hamas is connected to various purported "black separatist hate groups" that in turn influenced Johnson to shoot police officers. *See id.* ¶¶ 103–22. To connect Hamas to such "groups," Plaintiffs identify a scattershot of statements from social media users whom Plaintiffs characterize as "HAMAS sympathizers and members" expressing solidarity with what Plaintiffs characterize as "the uprising in Ferguson," Missouri, including statements that "[t]he oppressed stands with the oppressed" and advice for how to mitigate the effects of tear gas. *Id.* ¶ 105. Plaintiffs also allege that a photograph purportedly

United States District Court
Northern District of California

showing a member of Hamas beheading a prisoner has been edited by "black separatist hate groups" to show the beheading of a police officer and has been shared by those groups on Defendants' social media platforms.  *Id.* ¶¶ 106–07.  Casting a wider net, Plaintiffs allege connections between African American protest groups and other Palestinian or pro-Palestinian groups besides Hamas, including: (1) statements by the "BDS movement" (i.e., supporters of boycotts, divestment, and sanctions targeting Israel), a leader of the Council on American-Islamic Relations, and "Khalilah Sabra, another Islamic leader" in solidarity with "BLM" (i.e., "Black Lives Matter") protestors; (2) a YouTube video "uploaded by a user named Black-Palestinian Solidarity"; and (3) a 2015 visit "to the occupied Palestinian Territories and Israel" by "Black journalists, artists and organizers representing Ferguson, Black Lives Matter, Black Youth Project 100 (BYP100), and more," which included participating "in a weekly riot" in the West Bank to throw stones at Israeli soldiers and police officers.  *Id.* ¶¶ 108–11, 113, 119–20.  Plaintiffs also note that "[i]n 2016, Pro-Palestinian David Sheen completed a whirlwind tour to ISM[3] and BLM leftist groups across the U.S. receiving housing and support from well-known anarchists and other radicals."  *Id.* ¶ 112.

Next in the chain of causation, Plaintiffs allege statements by so-called "black separatist hate groups" supporting violence against police officers.  *Id.* ¶¶ 113–18.  Plaintiffs cite, for example, "demonstrators apparently calling for the deaths of police officers" during December 2014 protests in New York City—more specifically, a video on YouTube showing "a few dozen protestors marching down Fifth Avenue . . . apparently yelling out in unison 'What do we want? Dead cops.  When do we want it?  Now.'"  *Id.* ¶ 115.  During another demonstration, Plaintiffs allege that "Austin rotesters hant [sic[4]] 'What's Better Than 12 Dead Cops?  13 Dead Cops.'"  *Id.* ¶ 116.  During a 2016 Black Lives Matter protest, Plaintiffs allege that a speaker encouraged demonstrators to "pull your pistol out and . . . bust that" if confronted by police officers.  *Id.* ¶ 118.  As noted above, Plaintiffs also allege that social media users shared the image of a police officer being beheaded (edited from an original image of an alleged Hamas beheading), among other

---

[3] This abbreviation is not defined in the complaint.
[4] Presumably intended to be "protesters chanted."

posts calling for violence towards police officers.  *Id.* ¶ 117.

Aside from the conclusory assertion that "Johnson was radicalized, in part, by reviewing postings of HAMAS and other terrorist groups," *id.* ¶ 129, the only specific allegations regarding Johnson's use of Defendants' products are that he "'liked' the Facebook pages of Black Nationalist organizations such as the New Black Panther Party (NBPP), Nation of Islam, and Black Riders Liberation Army, three groups which are listed by the SPLC as hate groups," as well as "the Facebook page of the African American Defense League, whose leader, Mauricelm-Lei Millere, called for the murders of police officers across the U.S. following the fatal 2014 shooting of Laquan McDonald."  *Id.* ¶¶ 130–31.  The First Amended Complaint does not allege any connection between those specific groups and Hamas.

Plaintiffs bring five claims for relief: (1) liability under 18 U.S.C. § 2333 for aiding and abetting an act of international terrorism, FAC ¶¶ 156–66; (2) liability for conspiring in furtherance of such acts, *id.* ¶¶ 167–71; (3) providing material support to terrorists in violation of 18 U.S.C. §§ 2333 and 2339A, FAC ¶¶ 172–77; (4) providing material support to a designated foreign terrorist organization in violation of 18 U.S.C. §§ 2333 and 2339B, FAC ¶¶ 178–83; and (5) negligent infliction of emotional distress, *id.* ¶¶ 184–87.  The final claim, like the preceding four, is based entirely on Defendants' alleged provision of support to Hamas.  *Id.* ¶¶ 185–86.

### B.  Similar Cases

#### 1.  *Fields v. Twitter*

Judge Orrick considered allegations similar to those presented here in *Fields v. Twitter*, case number 16-cv-00213-WHO (N.D. Cal.).  The plaintiffs in that case were family members of United States government contractors killed in Jordan by a Jordanian police officer, Anwar Abu Zaid, in an attack for which the designated foreign terrorist organization ISIS[5] later claimed credit. *Fields v. Twitter* ("*Fields I*"), 200 F. Supp. 3d 964, 966 (N.D. Cal. 2016).  Although the plaintiffs in that case did "not allege that ISIS recruited or communicated with Abu Zaid over Twitter, that

---

[5] This order uses the term "ISIS," short for the "Islamic State of Iraq and Syria," for consistency with Judge Orrick's orders in *Fields*.  The group has also been known as the "Islamic State of Iraq and the Levant" (or "ISIL"), the "Islamic State" (or "IS"), or in Arabic, "ad-Dawlah al-Islamiyah" or "ad-Dawlah al-Islamiyah fi al-Iraq wa ash-Sham" (or "Daesh").

United States District Court
Northern District of California

1   ISIS or Abu Zaid used Twitter to plan, carry out, or raise funds for the attack, or that Abu Zaid

2   ever viewed ISIS-related content on Twitter or even had a Twitter account," they sought to hold

3   Twitter liable for the attack under 18 U.S.C. § 2333(a) based on allegations that ISIS used Twitter

4   to spread propaganda, raise funds, recruit members, and disseminate instructions for terrorist

5   attacks, and that ISIS's use of Twitter—and Twitter's alleged allowance of such use—was a

6   proximate cause of Abu Zaid's attack.  *Fields I*, 200 F. Supp. 3d at 967.

7           Twitter moved to dismiss based on the Communications Decency Act (the "CDA"), which

8   provides in relevant part that "[n]o provider or user of an interactive computer service shall be

9   treated as the publisher or speaker of any information provided by another information content

10  provider."  47 U.S.C. § 230(c)(1).  Judge Orrick held that § 230 applied to bar liability, rejecting

11  two specific arguments from the plaintiffs to the contrary.  First, the plaintiffs contended that

12  § 230 did not apply to claims based on Twitter providing accounts to ISIS, rather than based on

13  particular content.  *See Fields I*, 200 F. Supp. 3d at 970–75.  Judge Orrick held that such a theory

14  did not align with the plaintiffs' allegations, which in fact focused on the content of ISIS's Twitter

15  usage, in particular "'spreading extremist propaganda, raising funds, and attracting new recruits.'"

16  *Id.* at 971–72 (quoting the complaint).  He also held that providing accounts for Twitter's service

17  was sufficiently connected to Twitter's "'status or conduct as a publisher'" to fall within § 230's

18  grant of immunity, *id.* at 972 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir.

19  2009)), and that the causal connection between Twitter's alleged conduct (or inaction) and Abu

20  Zaid's attack, which was "tenuous at best regardless of the particular theory of liability plaintiffs

21  decide to assert," was "particularly weak under the provision of accounts theory because it [was]

22  based on specific content disseminated through Twitter, not the mere provision of Twitter

23  accounts," *id.* at 974.  As for the plaintiffs' contention that ISIS's alleged use of Twitter's "Direct

24  Messaging" feature fell outside the scope of § 230 immunity, Judge Orrick held that the private

25  nature of such messages did not alter the analysis, examining the broad meaning of "publication"

26  in the context of defamation law and citing several decisions that applied § 230 in cases involving

27  nonpublic messages "without questioning whether the [statute] applies in such circumstances."  *Id.*

28  at 975–76.  Judge Orrick therefore granted Twitter's motion and dismissed the complaint with

leave to amend.  *Id.* at 976.

The plaintiffs amended their complaint in an attempt to remedy the deficiencies identified in *Fields I*, but as in their initial complaint, the plaintiffs still did not allege that ISIS interacted with Abu Zaid using Twitter or that Abu Zaid had a Twitter account.  *Fields v. Twitter, Inc.* ("*Fields II*"), 217 F. Supp. 3d 1116, 1118 (N.D. Cal. 2016).  In other words, "[t]here [was] no connection between Abu Zaid and Twitter alleged."  *Id.*  Although the plaintiffs again argued that their claim was based on providing accounts, rather than regulation of content, Judge Orrick held that any policy of denying accounts to members of ISIS would require regulation of content—i.e., whatever content in a user name, profile picture, or tweets might identify a user as affiliated with ISIS—and thus fell within Twitter's role as a publisher and within the protection of § 230.  *Id.* at 1123–24.  Judge Orrick also held that the focus of the allegations remained based on ISIS's objectionable *use* of Twitter rather than mere provision of accounts, and that the plaintiffs had "not alleged any facts linking Twitter's provision of accounts to ISIS to Abu Zaid's attack," rejecting their contention that it was enough to "alleg[e] that Twitter provided ISIS with material support in the form of a powerful communication tool and that ISIS has claimed responsibility for Abu Zaid's actions."  *Id.* at 1125–27.  Judge Orrick once again rejected the plaintiffs' theory that use of direct messages fell outside the scope of § 230, and also rejected a new argument that policies underlying the CDA required an exception to § 230 for "'speech that aids designated terrorist organizations.'"  *Id.* at 1128–29 (quoting the plaintiffs' opposition brief).  Judge Orrick determined that he was "not at liberty to create" an exception that Congress failed to include in the statute, and that such an exception, despite targeting unquestionably objectionable content, could impose substantial burdens on service providers like Twitter and thus chill the free expression that such platforms otherwise promote.  *Id.* at 1129.  Judge Orrick dismissed the case with prejudice, *id.* at 1129–30, and an appeal is currently pending before the Ninth Circuit, *see Fields v. Twitter, Inc.*, No. 16-17165 (9th Cir.).

The similarities between *Fields* and the present case extend beyond merely raising similar issues.  Although *Fields* was brought by different plaintiffs represented by different counsel, the complaint in this case borrows many of its allegations verbatim from the *Fields* plaintiffs'

complaint—to the extent that certain paragraphs and headings here refer to ISIS where Plaintiffs

presumably intended to reference Hamas.  *E.g.*, FAC ¶ 165 ("Defendants' provision of material

support to ISIS was a proximate cause of the injury inflicted on Plaintiffs."); *cf.* 2d Am. Compl.

¶ 86, *Fields v. Twitter, Inc.*, No. 16-cv-00213-WHO, ECF Doc. No. 48 (N.D. Cal. Aug. 30, 2016)

("Defendant's provision of material support to ISIS was a proximate cause of the injury inflicted

on Plaintiffs."); *see also, e.g.*, FAC ¶ 102 ("Thus, not only does each Defendant provide material

support to HAMAS by allowing ISIS to make use of their social media sites, each Defendant

derives revenue from ISIS postings irrespective of the content of HAMAS' postings.").[6]  Despite

the substantial overlap between the allegations here and in *Fields*, and Defendants' substantial

reliance on both *Fields* decisions in their present motion (*see* Mot. (dkt. 43) at 3–4, 5, 9, 10, 13–

15, 16, 18 & nn.1, 3), Plaintiffs do not acknowledge either of those decisions in their opposition

brief.  *See generally* Opp'n (dkt. 44).

### 2. *Gonzalez v. Google*

The allegations in this case also overlap significantly with those of *Gonzalez v. Google,*

*Inc.*, No. 16-cv-3282-DMR (N.D. Cal.), another case filed after *Fields* and brought by plaintiffs

represented by the same counsel as Plaintiffs here, in that case based on a 2015 shooting attack in

Paris allegedly caused by Twitter, Google, and Facebook's support of ISIS.  One paragraph of the

present First Amended Complaint, for example, is copied from *Gonzalez* without alteration: "The

services and support that Defendants . . . provided to ISIS constitute material support to the

preparation and carrying out of international terrorism, including the attack in which Nohemi

Gonzalez was killed."  FAC ¶ 164.

In a decision issued after the hearing in this case, Judge Ryu granted Google's motion to

dismiss in *Gonzalez*, holding that the CDA barred all of the plaintiffs' claims.  *Gonzalez v.*

*Google, Inc.*, __ F. Supp. 3d __, No. 16-cv-03282-DMR, 2017 WL 4773366 (N.D. Cal. Oct. 23,

---

[6] Although Plaintiffs have substituted "Hamas" for "ISIS" in other allegations, certain allegations still appear out of place, as where Plaintiffs allege that material support provided by Defendants—internet social media companies that only achieved ubiquitous global usage in roughly the last decade—"has been instrumental to the rise of HAMAS," FAC ¶ 1, an organization active since the First Intifada in 1987, *see id.* ¶ 16.

2017).  Judge Ryu rejected the plaintiffs' argument that the 2016 Justice Against Sponsors of Terrorism Act ("JASTA") repealed the CDA's immunity provision for claims related to terrorism, as well as an argument that applying the CDA to the plaintiffs' claims would be an improper extraterritorial application of United States law.  *Id.* at *5–9.  Like Judge Orrick's decision in *Fields*, Judge Ryu also rejected the plaintiffs' distinction between a claim based on published content and a claim based on providing ISIS with accounts, and thus "access to powerful tools and equipment to publish their own content," holding that the plaintiffs' claims were "inextricably bound up with the *content* of ISIS's postings."  *Id.* at *10–11 (emphasis added).  Judge Ryu further held that the plaintiffs could not establish liability based on Google's imperfect efforts to remove offensive content—specifically, the fact that accounts removed by Google allegedly were able to "reconstitute" themselves easily by using similar names and "bulk friend/follow requests"—relying on the Ninth Circuit's decision in *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008), which recognized that Congress enacted the CDA to allow interactive computer service providers to police user-generated content on their platforms without becoming liable for any such content that the provider failed to remove.  *Gonzalez*, 2017 WL 4773366, at *11–12.

Judge Ryu also addressed the plaintiffs' arguments that Google, rather than its users, should be treated as the creator of content related to ISIS.  *Id.* at *12–15.  With respect to targeted advertisements that Google allegedly paired with ISIS's YouTube videos, Judge Ryu noted that the plaintiffs did not allege that any of the advertisements themselves promoted terrorism or were otherwise objectionable, and held that Google did not become the creator of the videos merely by displaying advertisements alongside them, distinguishing a Northern District of Texas case where a service provider supplemented user-generated content with titles and headings that were themselves defamatory.  *Id.* at *12–14 (distinguishing *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, No. Civ.A.3:02-CV-2727-G, 2004 WL 833595 (N.D. Tex. Apr. 19, 2004)).  To the contrary, the plaintiffs did not "suggest that Google's targeted ad algorithm is anything but content neutral," and the Ninth Circuit has "held that held that a search engine's provision of 'neutral tools to carry out what may be unlawful or illicit searches does not amount to [content] "development"

for purposes of the immunity exception.'" *Id.* at *13 (quoting *Roommates.com*, 521 F.3d at 1169). Finally, Judge Ryu rejected an argument the plaintiffs raised at the hearing that Google's sharing of advertising revenue provides a basis for liability, holding that the complaint did not plead that theory, and that the plaintiffs failed to allege that Google actually shared revenue with ISIS or that any such revenue was connected to the terrorist attack at issue. *Id.* at *14.

### C. Parties' Arguments

#### 1. Defendants' Motion

Defendants move to dismiss on a number of grounds. First, they argue that, as in *Fields*, the CDA bars all of Plaintiffs' claims, because Defendants are providers of "interactive computer services" and acted as publishers of third-party content with respect to all of Plaintiffs' allegations. Mot. at 8–15. According to Defendants, the allegations that they placed targeted advertisements alongside the content at issue and derived revenue from those advertisements do not change the analysis, *id.* at 10–12, nor does Plaintiffs' characterization of the claim as based on providing accounts or "infrastructure" rather than publishing content, *id.* at 13–15. Defendants also contend that the alleged causal chain between allowing Hamas and its members or supporters to post content and the Dallas shooting does not satisfy either a "direct relation" or "substantial factor" test of proximate cause, *id.* at 15–19, that the Dallas shooting was not an "act of *international terrorism*" within the meaning of 18 U.S.C. § 2333(d), *see* Mot. at 19–21, that Plaintiffs have not sufficiently alleged that Hamas "committed, planned, or authorized" the shooting within the meaning of that statute, *id.* at 21–22, and that Plaintiffs have not alleged that Defendants conspired with or aided the shooter, Micah Johnson, in any way, *id.* at 22–24. With respect to Plaintiff Demetrick Pennie, Defendants argue that Pennie cannot establish cognizable emotional distress damages because he lacks a familial relationship with any victim and did not directly perceive the attack itself. *Id.* at 24–25. Defendants request that this action be dismissed with prejudice. *Id.* at 25.

#### 2. Plaintiffs' Opposition

In their opposition brief, Plaintiffs contend that statements of purpose and intent in JASTA appearing as notes to § 2333, such as the purpose of "'provid[ing] civil litigants with *the broadest*

United States District Court
Northern District of California

*possible basis, consistent with the Constitution of the United States*, to seek relief,'" compel denial of Defendants' motion.  Opp'n at 3–4 (quoting Pub. L. No. 114-222, § 2(b), 130 Stat. 851, 852 (2016)) (emphasis added by Plaintiffs).  Plaintiffs argue that the Dallas shooting qualifies as international terrorism because "HAMAS has been declared an international terrorist organization" and uses Defendants' platforms to radicalize individuals and provoke attacks across national boundaries, including the Dallas shooting.  *Id.* at 5–6.  Plaintiffs also argue that their allegations satisfy the tests for conspiracy and aiding and abetting as articulated by the D.C. Circuit in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  Opp'n at 6–11.  Addressing an argument not raised in Defendants' motion, Plaintiffs' contend that their complaint alleges sufficient mens rea because deliberate indifference is enough to state a civil claim under the statutes at issue.  *Id.* at 11–14.  They argue that "but for" causation is not required for a claim under § 2333, particularly in light of the statements of purpose in JASTA, and that a plaintiff need not show a direct causal link between a defendant's contribution of support to a terrorist organization and a particular attack carried out by that organization.  *Id.* at 15–16 (citing, *e.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc)).  As for whether Hamas itself is sufficiently linked to the Dallas shooting, Plaintiffs present the following extended analogy:

> Assume that "Smith" gave a loaded gun to "Jones". Smith has knowledge that Jones is engaged in illegal, violent activity and although he does not have knowledge of what Jones might do with the gun, Smith is aware that Jones uses guns to commit violent, illegal acts. Jones places the loaded gun in a schoolyard hoping that a child will find the gun and shoot someone with the gun. Subsequently, "Tommy" finds the gun and shoots "Billy".
>
> First, even though Jones did not specifically know that Tommy would find the gun and shoot Billy, Jones would have liability for Billy's shooting. See *Auto Club Prop.-Cas. Ins. Co. v. B.T.*, 596 F. App'x 409, 410 (6th Cir. 2015). "Evidence that a defendant left a loaded gun in a place which he knew or should have known to be accessible to a child too immature or indiscreet to exercise the required care in the control of such an instrument has frequently been held to raise a jury question as to the defendant's responsibility for injuries caused by a child with a gun so left."; See also *United States v. May*, 430 F. App'x 520, 526 (6th Cir. 2011).
>
> Unlike the two cases cited above, our hypothetical Jones intended someone to find the gun. Auto Club and May found liability for

United States District Court
Northern District of California

11

> mere negligence. Liability would thus certainly attach here because Jones intended that someone would find the gun and engage in a violent act even though Jones never knew of Tommy or Billy. So too would liability for Smith.
>
> The above example is what we have here. Each Defendant plays the role of Smith. HAMAS is Jones. Micah Johnson is Billy. Each victim is Tommy. Defendants allow HAMAS to conduct terrorist operations using their tools. FAC ¶ 1. While Defendants do not directly participate in any of HAMAS' activities, they are aware that HAMAS is a terrorist organization and that HAMAS uses their tools to conduct terrorist operations. FAC ¶¶ 1, 178-183. Defendants provide content-neutral functionality within their platforms which enables HAMAS to raise funds, recruit, and radicalize individuals hoping those individuals will commit terrorist acts outside of HAMAS' direct sphere of influence such as the United States. FAC ¶¶ 1, 30-34, 123-138. Micah Johnson was radicalized by HAMAS' content, FAC ¶¶ 142-143, and conducted the attack on the Dallas Police. *Id.*
>
> Specifically, in the context of material support to terrorism, there is a strong precedent for holding Defendants liable for providing material support to HAMAS even without a direct awareness of Johnson and his terroristic plans. See *Boim*, 549 F.3d 685, 693. Since HAMAS "placed the gun in the schoolyard" by radicalizing Johnson, HAMAS is in part responsible for the Dallas attack even if HAMAS and Johnson had never been in contact or whether [sic] HAMAS had direct knowledge about the Dallas attack.

*Id.* at 16–18. According to Plaintiffs, "there is a direct causal connection between Defendants' actions and the Dallas attack." *Id.* at 18.

Turning to Defendants' argument that they are immune under the CDA, Plaintiffs contend that the broad statement of purpose in JASTA, recently enacted in 2016, trumps immunity under 47 U.S.C. § 230 in the context of support-for-terrorism claims. Opp'n at 18. Plaintiffs also argue that their claims are based on Defendants' provision of "resources" to Hamas, and do not seek to hold Defendants liable as speakers or publishers. *Id.* at 19–20. They argue that by voluntarily deleting certain Hamas-related accounts, "Defendants have scienter of the violative nature of the account and has [sic] assumed responsibility not to allow that account to reconstitute," and thus can be held liable for not taking steps to prevent blocked users from returning to Defendants' platforms under new account names. *Id.* at 20–21. Plaintiffs also contend that in pairing Hamas-related content with advertisements targeting particular users, Defendants act as "information content providers" rather than traditional publishers, and thus fall outside the scope of § 230 immunity, and that Google also provides support to Hamas outside of its role as a publisher by

12

1    sharing advertising revenue with Hamas.  *Id.* at 21–24.

2        Finally, Plaintiffs argue that Pennie can establish a cognizable injury due to his close

3    relationship with fellow officers in the Dallas Police Department and his emotional distress while

4    acting as a first responder.  *Id.* at 24–25.

5        **3.  Defendants' Reply**

6        In their reply, Defendants continue to argue that they are immune under § 230.  Reply (dkt.

7    45) at 1–6.  They contend that JASTA had no effect on § 230 immunity because repeal by

8    implication is disfavored and because Plaintiffs improperly rely on that law's "uncodified findings

9    and statement of purpose" rather than operative statutory language.  *Id.* at 1–4.  Defendants also

10   argue that a number of courts, including in *Fields*, have rejected Plaintiffs' theory that providing

11   accounts (or here, allowing deleted accounts to "reconstitute") falls outside the scope of § 230, and

12   Defendants dispute Plaintiffs' position that adding targeted advertisements to alleged Hamas

13   content alters the analysis.  *Id.* at 4–6.

14       Defendants reiterate their position that Plaintiffs have not alleged a sufficient causal

15   connection between Hamas's use of Defendants' services and the Dallas attack, *id.* at 7–8, and that

16   Plaintiffs have not established: (1) that the Dallas shooting was an act of "international terrorism"

17   within the meanings of 18 U.S.C. §§ 2331 and 2333; (2) that a foreign terrorist organization

18   "committed, planned, or authorized" the attack within the meaning of § 2333(d); (3) that

19   Defendants provided assistance to the person who "committed" the attack within the meaning of

20   that statute; (4) that Defendants knew of a particular illegal scheme and provided "substantial"

21   assistance to the "principal violation"; or (5) that Defendants entered any "agreement with

22   Johnson (or anyone else) 'to participate in an unlawful act.'"  Reply at 8–11 (citation omitted).

23   Defendants also respond to arguments in the opposition brief that they contend do not correspond

24   to anything in their motion,[7] arguing that Plaintiffs' allegations neither establish sufficient mens

25   rea nor meet the other elements of "international terrorism," the latter because "an alleged material

26

27   _____

28   [7] According to Defendants, the mismatch "seems to stem from Plaintiffs' having copied much of
     their opposition from another brief their counsel recently filed in another case," i.e., *Gonzalez*, No.
     16-cv-03282-DMR.  Reply at 12–13.

United States District Court
Northern District of California

1   support violation does not, by itself, satisfy" those elements. *Id.* at 13–15. Defendants again

2   argue that Pennie lacks both a sufficient familial connection to a victim and sufficient firsthand

3   perception of the attack to state a claim for emotional distress damages. *Id.* at 11–12.

### III.   ANALYSIS

####    A.   Legal Standard

6       A complaint may be dismissed for failure to state a claim on which relief can be granted

7   under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss

8   under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp.*

9   *Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a plaintiff's burden at the pleading stage

10  is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which

11  sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing

12  that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

13      In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and

14  takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

15  non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

16  Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that

17  would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

18  1990). A complaint must "contain either direct or inferential allegations respecting all the material

19  elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v.*

20  *Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101,

21  1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

22  of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

23  (quoting *Twombly*, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion

24  couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S.

25  265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of

26  'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)

27  (alteration in original). Rather, the claim must be "'plausible on its face,'" meaning that the

28  plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable

United States District Court
Northern District of California

14

1  inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S.

2  at 570).

3      **B.    The First Amended Complaint Does Not Establish Proximate Cause**

4          The parties dispute the appropriate test of proximate cause for Plaintiffs' claims.

5  Defendants argue that in light of § 2333's language creating a cause of action for persons injured

6  "'by reason of'" international terrorism, a plaintiff must show "'some direct relation between the

7  injury asserted and the injurious conduct alleged.'" Mot. at 16 (quoting 18 U.S.C. § 2333(a);

8  *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) (interpreting similar language in the

9  Racketeer Influenced and Corrupt Organizations Act)).  Plaintiffs argue that the conduct at issue

10  need not be a but-for cause of the attack, and that it is enough to establish that access to

11  Defendants' services "'was a substantial reason that Hamas was able to perpetrate the terrorist

12  attacks at issue, and that Hamas' increased ability to carry out deadly attacks was a foreseeable

13  consequence' of providing such material support."  Opp'n at 16 (quoting *Linde v. Arab Bank,*

14  *PLC*, 97 F. Supp. 3d 287, 328 (E.D.N.Y. 2015)).  Assuming for the sake of argument that

15  Plaintiffs are correct as to the standard, the Court agrees with Defendants that the complaint must

16  be dismissed for failure to establish that any purported "support" provided to Hamas was a

17  substantial factor leading to the Dallas shooting.

18          Among the more permissive decisions on this issue is *Boim*, in which the Seventh Circuit

19  held that although § 2333 did not at the time create secondary liability for aiding and abetting—

20  subsection (d), which now explicitly authorizes such liability, had not yet been enacted—its

21  incorporation of § 2339A, which criminalizes providing material support to terrorism, implicates

22  principles similar to aiding and abetting, and based on doctrines developed to deal with concurrent

23  causes like multiple negligently-set fires converging on a plaintiff's house, a person who gives

24  money to even the charitable arm of a known terrorist organization like Hamas can be held liable

25  for acts of terrorism by such a group without need to trace the funds provided by the defendant to

26  the particular attack that injured the plaintiff.  *See Boim*, 549 F.3d at 689–99; *see also*, *e.g.*,

27  *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013) ("[P]laintiffs who

28  bring [a § 2333] action are not required to trace specific dollars to specific attacks to satisfy the

United States District Court
Northern District of California

proximate cause standard."). In that case, however, while the connection between the particular support provided and the attack was arguably tenuous, the connection between the terrorist organization and the attack was not. *See Boim*, at 687 (stating that the plaintiffs alleged "[their son's] killers had been Hamas gunmen"); *see also Strauss*, 925 F. Supp. 2d at 433 ("Here, Hamas carried out the attacks . . . .").

Whatever relationship Defendants' alleged provision of social media services to Hamas might have to Hamas's own operations, the clearest break in the causal chain here lies between Hamas and the Dallas attack. Aside from conclusory assertions that do not meet the *Iqbal* and *Twombly* standard for factual allegations, *e.g.*, FAC ¶¶ 129, 132–34,[8] Plaintiffs do not meaningfully allege that Hamas itself carried out the attack, or even that it intended for such an attack to occur. Instead, they allege that *other* Palestinians and Palestinian organizations (whom Plaintiffs vaguely characterize as "HAMAS sympathizers and members") expressed general support for groups protesting police violence against African Americans, FAC ¶¶ 105, 109, 113, 119–20, including some such groups that have staged protests or rallies where speakers or demonstrators called for killing police officers, *id.* ¶¶ 115–18, and that "Micah Johnson was radicalized, in part, by these organizations calling for the murders of police officers," *id.* ¶ 122. The only specific organizations that Plaintiffs allege Johnson interacted with using Defendants' services are yet *other* groups whose Facebook pages he "liked"—the New Black Panther Party, the Nation of Islam, the Black Riders Liberation Army, and the African American Defense League—but Plaintiffs do not allege any connection between Hamas and any of those groups. *See id.* ¶¶ 130–31. Instead, the present complaint, as amended after Defendants' first motion to

---

[8] Plaintiffs assert, for example, that "[o]n information and belief, Micah Johnson was radicalized, in part, by reviewing postings of HAMAS and other terrorist groups on the internet and Defendants' social media sites." FAC ¶ 129. That assertion is comparable to allegations at issue in *Iqbal*, where the Supreme Court held too conclusory to be cognizable allegations that governmental defendants subjected the plaintiff to harsh confinement on account of his religion, race, or national origin, "that [then–Attorney General] Ashcroft was the 'principal architect' of this invidious policy, and that [then–FBI Director] Mueller was 'instrumental' in adopting and executing it." *Ashcroft v. Iqbal*, 556 U.S. at 680–81 (citations omitted). Absent any factual allegations regarding the Hamas postings that Johnsons allegedly viewed and their relationship to the shooting, the assertions here that Hamas radicalized Johnson are both too conclusory to be taken as true and too vague to establish proximate cause.

1      dismiss, details contacts between African American and Palestinian organizations with no

2      apparent relevance to this case, like the "10-day trip to the occupied Palestinian Territories and

3      Israel" in 2015 by "Black journalists, artists and organizers," with no allegation that Hamas or the

4      groups that Johnson "liked" on Facebook participated in that trip.  *See id.* ¶ 110.

5            *Boim* and similar decisions stand for a rule that a defendant who has provided funds to a

6      terrorist organization can be held liable for any subsequent attack *by that organization*, without

7      need to trace the defendant's funds to the particular attack.  Here, Plaintiffs seek to extend that rule

8      to encompass liability for an attack by a person who had engaged on social media with groups that

9      arguably shared an ideological affiliation with groups that received expressions of solidarity from

10     groups that shared an ideological affiliation with a designated foreign terrorist organization to

11     which Defendants provided support.  Plaintiffs' gun-in-a-schoolyard analogy notwithstanding, *see*

12     Opp'n at 16–18, Plaintiffs cite no case where liability has been based on such a tenuous

13     connection between an attack and the foreign terrorist group that a defendant allegedly supported.

14           Plaintiffs also allege that an unspecified "black separatist hate group" edited a photograph

15     purportedly depicting a member of Hamas beheading a prisoner to instead show a masked person

16     beheading a police officer and subsequently circulated that image through Defendants' services,

17     but do not allege that Hamas played any role in repurposing that image to express anti-police

18     sentiment, or that Johnson ever saw the image in question.  *See* FAC ¶¶ 106–07.

19           The complaint here does not plausibly allege that Hamas "committed, planned, or

20     authorized" the Dallas attack, or that it was "the person who committed" the attack, within any

21     reasonable interpretation of those terms in 18 U.S.C. § 2333(d).  Although asserting in general

22     terms that Hamas seeks to "incite others outside . . . of [its] sphere of influence," *see* Tr. at 6:10–

23     13, Plaintiffs do not allege that Hamas had or expressed any intent to facilitate attacks on police

24     officers in the United States.  *See Boim*, 549 F.3d at 694 (noting that "unlike some other terrorist

25     groups, Hamas's terrorism is limited to the territory of Palestine, including Israel").

26           Without some meaningful connection between Hamas and the attack, Defendants' alleged

27     provision of support to Hamas does not meet even Plaintiffs' test of proximate cause: absent

28     plausible allegations that Hamas itself was in some way a "substantial factor" in the attack, there is

United States District Court
Northern District of California

17

no basis to conclude that any support provided by Defendants to Hamas was a substantial factor. *Cf. Strauss*, 925 F. Supp. 2d at 432.  Because all of Plaintiffs' claims are based on Defendants' alleged support of Hamas, the failure to allege a plausible causal connection between Hamas and the Dallas attack warrants dismissal of all claims.

Plaintiffs have not identified any allegations that they could add to their complaint to cure the failure to establish a meaningful connection between Hamas and the Dallas attack.  In response to the Court's concerns about the lack of such a connection, Plaintiffs' counsel suggested at the hearing that Plaintiffs could amend their complaint to allege that groups Johnson "liked" on Facebook had contact with Hamas.  *See* Tr. (dkt. 54) at 15:3–16:23.  But Plaintiffs concede that Hamas never directly communicated with Johnson, and that they do not know whether Johnson ever viewed Hamas social media content.  *Id.* at 4:22–25, 14:8–9.  Plaintiffs have not suggested that they could allege that Hamas instructed or encouraged groups like the New Black Panther Party to foment the sort of attack that Johnson committed, nor that Johnson viewed material from those groups calling for such an attack.  An amended allegation that Hamas at some point communicated with radical groups that Johnson "liked" on Facebook would not establish that Hamas was responsible for Johnson's attack on police officers in Dallas.  The Court concludes that amendment would be futile.

### C.     The CDA Bars Most if Not All of Plaintiffs' Claims

In addition to the defect of causation discussed above, the CDA immunizes Defendants from most if not all of Plaintiffs' claims, because Plaintiffs' theory of liability rests largely on the premise that Defendants should be held responsible for content created and posted by users (here, Hamas and its affiliates) of Defendants' interactive computer services.  The CDA states in relevant part that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  This section "immunizes providers of interactive computer services against liability arising from content created by third parties," so long as "the interactive computer service provider is not also an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content."

1    *Roommates.com*, 521 F.3d at 1162 (quoting 47 U.S.C. § 230(f)).  "[S]eparated into its elements,

2    section 230(c)(1) protects from liability only (a) a provider or user of an interactive computer

3    service (b) that the plaintiff seeks to treat as a publisher or speaker (c) of information provided by

4    another information content provider."  *Fields I*, 200 F. Supp. 3d at 969 (citing *Barnes v. Yahoo!,*

5    *Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009)).  As far as this Court is aware, every court that has

6    considered the issue has held that the CDA bars claims similar to those presented here, even where

7    the user posting objectionable content to an interactive service is, or is affiliated with, a foreign

8    terrorist organization.  *See id.*; *Gonzalez*, __ F. Supp. 3d __, 2017 WL 4773366; *Cohen v.*

9    *Facebook, Inc.*, 252 F. Supp. 3d 140, 157–61 (E.D.N.Y. 2017); *Fields II*, 217 F. Supp. 3d 1116.

10       As a starting point, JASTA does not implicitly repeal the CDA with respect to foreign

11   terrorist organizations' use of interactive computer services.  "'[R]epeals by implication are not

12   favored' and will not be presumed unless the 'intention of the legislature to repeal [is] clear and

13   manifest.'"  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (quoting

14   *Watt v. Alaska*, 451 U.S. 259, 267 (1981)) (second alteration in original).  For a later-enacted

15   statute to amend or repeal an earlier statute not explicitly referenced therein, it must "'expressly

16   contradict'" the earlier statute or be so incompatible that inferring amendment or repeal is "'is

17   absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at

18   all.'"  *Id.* (quoting *Traynor v. Turnage*, 485 U.S. 535, 548 (1988)) (alterations in original).  No

19   clear legislative intent to repeal or amend the CDA is apparent in JASTA, which explicitly

20   modifies a separate immunity not at issue here—the Foreign Sovereign Immunities Act—but does

21   not discuss the CDA or its subject matter.  *See* JASTA § 3(a), Pub. L. No. 114-222, 130 Stat. 852,

22   853 (2016) (codifying 28 U.S.C. § 1605B to limit foreign sovereign immunity).  As Judge Ryu

23   concluded in *Gonzalez*, "[t]his demonstrates that where Congress intended JASTA to repeal

24   existing statutory immunities, it made that clear."  *Gonzalez*, 2017 WL 4773366, at *6.  Plaintiffs

25   rely on the statute's broad and uncodified statement of purpose "to provide civil liability with the

26   broadest possible basis" against entities providing material support to foreign terrorist groups.

27   JASTA § 2(b); Opp'n at 3–4.  But it "is well settled that prefatory clauses or statements of purpose

28   do not change the plain meaning of an operative clause," and "JASTA's statement of purpose

19

'cannot bear the weight' that Plaintiffs place on it." *Gonzalez*, 2017 WL 4773366, at *7 (quoting *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009)). With no operative, codified provisions that conflict with the CDA, it is not "absolutely necessary" to construe JASTA as amending the CDA for JASTA to have meaning. *See Defs. of Wildlife*, 551 U.S. at 662. The Court holds that JASTA has no effect on the scope of Defendants' immunity under the CDA in this case.

Aside from their argument based on JASTA, Plaintiffs argue that the CDA does not apply here because they do not seek to hold Defendants liable as publishers or speakers of other people's content. Opp'n at 19–23. Plaintiffs contend that their claims "do not depend upon the *content* that HAMAS or its operatives post," but instead on Defendants allowing Hamas to use their services at all, arguing that "[s]ince Defendants are prohibited by federal criminal law from providing support to HAMAS, they have no discretion to permit the use of their resources by HAMAS," and need not exercise any editorial discretion to comply with the laws barring material support to terrorist organizations. *Id.* at 19–20. First, this characterization of Plaintiffs' claims is false: Plaintiffs explicitly base their claims on the *content* that Hamas allegedly posts, because absent offending content, there would be no basis for even the frivolous causal connection that Plaintiffs have alleged between Defendants' services and the Dallas attack. *See Gonzalez*, 2017 WL 4773366, at *11; *Cohen*, 252 F. Supp. 3d at 157–58. Second, as two other judges of this Court have noted, Defendants could only determine which accounts are affiliated with Hamas by reviewing the content published by those accounts—the substantive posts and media that users share, as well as the names and profile pictures that users choose to identify their accounts. *Fields II*, 217 F. Supp. 3d at 1123 ("A policy that selectively prohibits ISIS members from opening accounts would necessarily be content based as Twitter could not possibly identify ISIS members without analyzing some speech, idea or content expressed by the would-be account holder . . . ."); *Gonzalez*, 2017 WL 4773366, at *11 (quoting *Fields II* with approval).

Plaintiffs also argue that Defendants can be held liable for "allowing an account that has been taken down to reconstitute," on the basis that by voluntarily removing an account from their services, "Defendants have scienter of the violative nature of the account and has [sic] assumed

United States District Court
Northern District of California

United States District Court
Northern District of California

1   responsibility not to allow that account to reconstitute." Opp'n at 20–21.  This argument is

2   foreclosed by the Ninth Circuit's recognition that, under the CDA, good faith efforts to remove

3   objectionable content cannot create liability for service providers' failure to remove all such

4   content, and that the statute instead "allow[s] them to perform some editing on user-generated

5   content without thereby becoming liable for all defamatory or otherwise unlawful messages that

6   they didn't edit or delete."  *Roommates.com*, 521 F.3d at 1174; *see also* 47 U.S.C. § 230(c)(2)

7   (barring liability for "any action voluntarily taken in good faith to restrict access to or availability

8   of material that the provider or user considers to be . . . objectionable"); *Gonzalez*, 2017 WL

9   4773366, at *12.

10          Next, Plaintiffs contend that Defendants can be held liable as creators of content, rather

11   than merely interactive service providers, because Defendants select advertisements to pair with

12   content on their services—allegedly including content posted by Hamas—"based on what is

13   known about the viewer and what the viewer is looking at." Opp'n at 21–23 (citing, *e.g.*,

14   *Roommates.com*, 521 F.3d at 1163, 1166–67, 1171).  An "entity that is responsible, in whole or in

15   part, for the creation or development of information" is not immune under the CDA for liability

16   related to the publication of that information.  *See* 47 U.S.C. § 230(f)(3); *Roommates.com*, 521

17   F.3d at 1166.  The Ninth Circuit has "interpret[ed] the term 'development,'" however "as referring

18   not merely to augmenting the content generally, but to materially contributing to its alleged

19   unlawfulness.  In other words, a website helps to develop unlawful content, and thus falls within

20   the exception to section 230, if it contributes materially to the alleged illegality of the conduct."

21   *Roommates.com*, 51 F.3d at 1167–68.  Here, as in *Gonzalez*:

22          Plaintiffs do not allege that [Defendants] "materially contribut[ed]"
           in any way to the actual content of [Hamas social media posts].
23          They do not claim that [Defendants'] ads (which are themselves
           third-party content) are objectionable, or that the ads played any role
24          in making [Hamas's content] unlawful. For example, Plaintiffs do
           not allege that any ads paired with [Hamas]-related content offered
25          tools or instructions on how to carry out [Hamas's] threats, or
           otherwise encouraged individuals to commit acts of terrorism. The
26          [First Amended Complaint] contains [four] screenshot example[s] of
           an alleged targeted ad next to [a Hamas] video on YouTube . . . .
27          [FAC ¶¶ 42, 96.] Plaintiffs do not make any allegations about the

28

21

1
2
3
4

> relationship between [the products advertised[9]] and terrorism. *See, e.g.*, *Jones* [*v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 416–17 (6th Cir. 2014)] (holding interactive service provider was not information content provider as to allegedly defamatory third party posts; even though provider appended his own comments to the posts, the plaintiff did not allege that the provider's comments were themselves defamatory).

5   *See Gonzalez*, 2017 WL 4773366, at *13 (second alteration in original).  Like in *Gonzalez*,

6   Defendants' "provision of neutral tools, including targeted advertising, does not equate to content

7   development under section 230, because . . . the tools do not encourage the posting of unlawful or

8   objectionable material." *Id.*; *cf. Roommates.com*, 521 F.3d at 1165–67 (holding that the defendant

9   engaged in content development outside the scope of the CDA's immunity provision by creating a

10   system that required users to disclose whether they were members of certain protected classes and

11   allowed other users to screen housing applicants based on that information).

12       Finally, Plaintiffs argue that Google's alleged sharing of advertising revenue with Hamas

13   is not protected by the CDA.  Opp'n at 23–24.  The question of whether, or under what

14   circumstances, the CDA immunizes payments made by interactive service providers to content

15   developers appears to be a novel issue.[10]  Google relies on the District Court for the District of

16   Columbia's decision in *Blumenthal v. Drudge*, which held that an internet provider's contract for

17   payment to "gossip and rumor" writer Matt Drudge did not affect the scope of the provider's

18   immunity under the CDA for content written by Drudge.  *Blumenthal*, 992 F. Supp. 44, 50–53

19   (D.D.C. 1998); Reply at 6 & n.5.  Assuming for the sake of argument that this Court would follow

20   *Blumenthal*'s holding that CDA immunity applied to user-generated *content* even where a service

21   provider paid for that content, *Blumenthal* does not address the question of whether the CDA

22   immunizes *payments* that otherwise could themselves give rise to liability.  Providing money to

23

---

24   [9] In this case, the advertisements are for car insurance, FAC ¶ 42, a product offering "the tools and the team to grow your small business," *id.* ¶ 96, Velveeta "Famous Queso! Mix," *id.* ¶ 99, and a
25   home heating and cooling system, *id.* ¶ 100.  In *Gonzalez*, the only advertisement documented in the plaintiffs' complaint was for "a product called 'ThreatMetrix Cybercrime Report: Q4 2015.'"
26   *Gonzalez*, 2017 WL 4773366, at *13.
     [10] The plaintiffs in *Gonzalez* raised this theory for the first time at the hearing on Google's motion
27   to dismiss.  *Gonzalez*, 2017 WL 4773366, at *14.  Without reaching the question of whether the CDA immunizes payments, Judge Ryu held that the plaintiffs' complaint did not plead that theory
28   of liability and failed to allege that Google actually shared advertising revenue with ISIS or that any such revenue was connected to the attack at issue.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

Matt Drudge generally is legal; providing money to Hamas generally is not.  *See Boim*, 549 F.3d at 693–94.  Because Plaintiffs' failure to allege a causal connection between Hamas and the Dallas shooting is reason enough to dismiss all claims, the Court declines to resolve the question of if or how the CDA applies where an interactive service provider shares advertising revenue with a content developer that has been designated as a foreign terrorist organization.  With respect to all other theories of liability against Google, however, as well as all claims against Defendants Twitter and Facebook, section 230 of the CDA is a separate and sufficient basis for dismissal.

## IV.    CONCLUSION

As discussed above, Plaintiffs do not plausibly allege a connection between Hamas and the Dallas shooting, and thus fail to establish that Defendants' alleged support of Hamas was a proximate cause of Plaintiffs' injuries.  At the hearing, Plaintiffs were not able to identify additional factual allegations they could make to resolve this deficiency if given leave to amend. Most if not all of Plaintiffs' claims are also barred by the CDA.  Defendants' motion is therefore GRANTED, and the action is DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: December 4, 2017

JOSEPH C. SPERO
Chief Magistrate Judge